Board of Hudson River Regulating District, Plaintiff, *v.* Fonda, Johnstown and Gloversville Railroad Company and Another, Defendants.

Supreme Court, Fulton County, March 31, 1926.

Waters and watercourses — proceedings to condemn land and right of way of railroad for Hudson River Regulating District — Conservation Law, §§ 431 et seq., authorizes condemnation of land devoted to public use for purposes of regulating district — act of board in taking land above high-water level was necessary and could be reviewed only by certiorari — acquiring land of railroad is not interference with interstate commerce in violation of United States Constitution, art. 1, § 8 — furthermore railroad may relocate its line and it must apply to Federal authorities for permission — Sacandaga river at point in question is not navigable water under Federal statute — plaintiff made effort to agree with defendant and mortgagee of railroad as to price — negotiations directly with mortgagee not necessary — failure of plaintiff to serve offer and formal notice of appropriation on mortgagee not fatal — notice and petition in condemnation were sufficient — impounding water for purpose of regulating flow of Hudson river is public use — fact that private interests may be benefited does not deprive use of its public character — plaintiff cannot, under law, as it existed when proceedings were commenced condemn part of railroad's right of way for purpose of new highway.

This proceeding was instituted under article VII-A of the Conservation Law to condemn a part of defendants' railroad right of way for the purpose of establishing a river regulating storage reservoir within the Hudson River Regulating District. The proposed reservoir is to be located on the Sacandaga river, a tributary of the Hudson river, and it is proposed to take not only land sufficient for the reservoir but in addition enough land surrounding the proposed reservoir to give the plaintiff control over the reservoir proper and to protect it from interference. The defendant trust company is the owner of bonds of the defendant railroad. The contention by the defendants that the plaintiff cannot take land devoted to one public use for another public use cannot be sustained, since section 446 of the Conservation Law gives plaintiff the power to condemn real estate and subdivision 1 of section 430 defines real estate as including that

" used for railroad, highway or other public purposes " and section 445 of the Conservation Law gives the plaintiff a dominant right of eminent domain over the right of eminent domain of public corporations, except cities, with the limitation that, in the exercise of the right, " due care shall be taken to do no unnecessary damage to other public utilities." Therefore, the plaintiff was given the express power to acquire by condemnation property of a railroad corporation for the purpose of establishing a reservoir.

Unnecessary damage is not shown by taking land above the elevation of the water surface, for that land must be taken for safety to protect the plaintiff against damages in cases where wave action due to flood might cause the water to rise above the crest of the dam. Moreover, the determination of the lines of the proposed reservoir was for the plaintiff and was reviewable only by certiorari and not in this proceeding to condemn.

The contention by the defendants that the act of the plaintiff in taking property of a railroad engaged in interstate commerce is a violation of clause 3 of section 8 of article 1 of the Federal Constitution cannot be sustained, for the Conservation Law relating to river regulating districts does not in any way purport to regulate commerce nor does the act of condemning the property of the defendant railroad constitute a regulation of or interference with interstate commerce, and the Federal Constitution was not intended to restrict the rights of the States in the exercise of the power of eminent domain. Hence, it was not necessary for the plaintiff to procure the consent of Federal authorities and if the relocation of the defendant railroad's line, because of the fact that its present right of way is taken, be considered new construction within the meaning of the Interstate Commerce Act (24 U. S. Stat. at Large, 379), as amended by the Transportation Act of 1920 (41 U. S. Stat. at Large, 477, 478), and that the consent of the Interstate Commerce Commission is necessary, it is the duty of the defendant railroad to make application for that consent; the plaintiff could not make the Interstate Commerce Commission a party to this proceeding.

It was not necessary for the plaintiff to procure the consent of Congress to the construction of the dam and the consequent obstruction of the Sacandaga river under sections 9 and 10 of chapter 425 of the act of March 3, 1899 (30 U. S. Stat. at Large, 1121, 1151), for the evidence shows that the Sacandaga river at the point in question and above that point, while it has been navigated in the past to a limited extent by small boats and has been used for the purpose of floating logs, is not navigable water within the meaning of that term as used in the Federal statute, and the consent of the Federal government under the Federal Water Power Act of June 10, 1920 (41 U. S. Stat. at Large, 1063, 1065), was not necessary, for that act does not apply to the Sacandaga river.

The contention that the plaintiff has not complied with section 446 of the Conservation Law in that it has not made an effort to purchase the property from the defendant railroad and from the defendant trust company, the mortgagee, is not proven, for it appears that negotiations were opened with the railroad and that it submitted a proposed offer prepared by the trust company, which offer was met by a proposal on the part of the plaintiff and further negotiations appearing to be futile, the plaintiff served notice on the defendant railroad of appropriation; any negotiations with the mortgagee would have been ineffective without an agreement with the defendant railroad.

It was not fatal to the present proceeding that the formal offer by the plaintiff for the purchase of the land in question was not served on the mortgagee, and likewise the failure to serve formal notice of appropriation on the mortgagee is not fatal.

**868** Bd. of Hudson R. Regulating Dist. *v.* F., J. & G. R. R. Co.

Supreme Court, March, 1926.                    [Vol. 127

The notice of appropriation and the petition in condemnation were sufficient, for the law does not require that the notice of appropriation shall be served prior to the service of the petition, and it is not improper to serve the notice at the same time the petition is served.

The use to which the plaintiff is to put the land in question is a public use inasmuch as the avowed purpose is to regulate the flow of the Hudson river in such a way as to prevent the dangers and damages arising from flood water in the spring of the year and to permit increased flow during other periods of the year when the natural flow is decreased to such an extent as to expose swamps and lowlands which would breed germs, bacteria and cause damage to the public. The purpose, then, to which the land will be used is for the public welfare, including public health and safety and the mere fact that private persons will, through the water power developed by the dam and the storage reservoir, be benefited, does not deprive the purpose of its character as a public use, for that use is merely incidental to the real purpose of the reservoir.

The plaintiff did not have the power, as the Conservation Law stood at the time this proceeding was instituted, to condemn a part of the railroad company's right of way to be used for the relocation of the State highway which is to be taken for reservoir purposes and for the purpose of straightening the State highway in other places, which are dangerous, because of sharp turns, for that right was not given to plaintiff by the Conservation Law under which it is proceeding.

Proceeding pursuant to Conservation Law to condemn a part of defendant railroad's right of way, heard at the Schenectady Special Term.

*Charles W. Walton* [*Nathan L. Miller, Frank L. Wiswall* and *Charles N. Nourse* of counsel], for the plaintiff.

*Wesley H. Maider* [*Charles S. Nisbet* and *Andrew J. Nellis* of counsel], for the defendant railroad company.

*Hornblower, Miller & Garrison* [*Lindley M. Garrison* and *Charles E. Gately* of counsel], for the defendant trust company.

*C. T. Dawes, Deputy Attorney-General,* for the State Comptroller.

Whitmyer, J. This is a proceeding, under article VII-A of the Conservation Law, to condemn a part of defendant railroad's right of way, about half-way between the city of Gloversville and the village of Northville, Fulton county, this State, with stations and terminal facilities at the villages of Mayfield, Northville and Cranberry Creek, for the construction and maintenance of a dam and reservoir, at Conklingville, above the confluence of the Hudson and Sacandaga rivers, including lands to be used for the relocation of the existing State highway, where it will be flooded, and, also, where it will not be flooded. The article relates to " River Regulation by Storage Reservoirs " and was added to the Conservation Law by chapter 622 of the Laws of 1915. Section 431 provides for the creation of river regulating districts, with powers to construct, maintain and operate reservoirs therein for the purpose of regulating

the flow of streams, when required by the public welfare, including public health and safety.   The Hudson River Regulating District was duly created as a public corporation by the Water Control Commission on August 2, .1922, pursuant to sections 432, 433 and 434 of the article, to regulate the flow of the Hudson for the purposes stated.   The railroad company opposed, but did not review the determination, and no one else reviewed it   Section 431 provides that such a district shall have perpetual existence and the power to acquire and hold such real estate and other property as may be necessary, to sue and be sued, to incur debts, liabilities and obligations, to exercise the right of eminent domain and of assessment and taxation, to issue bonds and other evidences of indebtedness and to do all acts and exercise all powers authorized by and subject to the provisions of the article.   And it provides that such powers shall be exercised by and in the name of the Board of the district.   Upon creation, the members of the Board were duly appointed, they duly qualified, and the Board was duly organized, pursuant to sections 436–438, both inclusive, and thereupon, by section 445, on behalf of the district became vested with and now has the powers set forth in said section 431 (as amd. by Laws of 1920, chap. 463), and in addition thereto all such other powers as are necessary and proper to carry into execution the powers expressly granted, with charge of the operation of all reservoirs in existence or to be constructed for the regulation of the flow of the river and its tributaries in the district, excluding reservoirs maintained primarily to provide water for the canal system of the State, and, subject to the limitations of the article, with a dominant right of eminent domain over the right of eminent domain of public corporations, except cities, but with the limitation that due care shall be taken to do no unnecessary damage to other public utilities and, in case of failure to agree upon the mode and terms of interference, that their operation and usefulness shall not be interfered with beyond the actual necessities of the case.   Further, under section 446 (as amd. by Laws of 1922, chap. 665), the Board, subject to the limitations in the article, has the right to condemn, for the use of the district, any real estate which is determined to be necessary for the purpose of carrying out any of the provisions of the article. And section 430, subdivision 1, defines " real estate " as including that " acquired or used for railroad, highway or other public purposes."   Upon organization, in accordance with section 443, the Board prepared a general plan for the district, approved it, certified it to the Commission for its approval, and the Commission duly approved it, so that it became the " Official Plan."   That plan provided, among other things, for the construction of a reser-

**870** Bd. of Hudson R. Regulating Dist. *v.* F., J. & G. R. R. Co.

Supreme Court, March, 1926. [Vol. 127

voir, with an available capacity of 30,000,000,000 cubic feet, at Conklingville on the Sacandaga. Then in accordance with section 450, and as a part of the official plan, the Board duly determined that the public welfare, including public health and safety, required that the Sacandaga reservoir should be built, duly prepared preliminary plans, maps, estimates, surveys, statements and specifications therefor, duly approved them and certified them to the Commission, that body duly approved and certified them, and the Board, after filing and after due hearing and consideration, duly determined that the public welfare, including public health and safety, required the construction of the reservoir; the railroad company opposed, but did not review the determination and no one else reviewed it. All steps to and including the adoption of the preliminary plan have been duly taken and defendants do not object thus far. Upon the adoption of the plan, the Board determined that the real estate sought was necessary for said purposes and made efforts to acquire it without proceedings, as provided by section 446. The railroad is engaged in interstate commerce. Its main line extends from Fonda to Northville and is about twenty-five and one-half miles long. And it has a branch, known as the Broadalbin branch, about seven miles long. Plaintiff desires to take about seven miles of the main line, half-way between Gloversville and Northville, about half of a mile of track and right of way at Northville, and stations, side tracks and terminal facilities at Mayfield, Northville and Cranberry Creek. The trust company is the owner of bonds outstanding in the sum of $7,000,000, and of mortgages, liens upon all of the property, aggregating $8,200,000. Some time in 1924 the Board commenced to negotiate with the railroad company. The attorney and the engineer acted for the company. Early in September, 1924, it asked the company for a statement of its claim. On September twelfth the attorney wrote that he was sending the statement and he inclosed a letter, dated September tenth, from the attorneys for the trust company, to the Board, to the effect that they had read and examined the summary of the claims, aggregating $4,193,768, together with the statements upon which such summary was based, as prepared by the engineer for the railroad, and that they approved same. The items were cost of relocation, $1,439,119; damage due to increased cost of operation, maintenance and loss of revenue, $1,350,293; damage to Sacandaga Park, $1,304,356, and administration, engineering and legal expenses, $100,000. Representatives of the Board and the railroad company discussed the claim a number of times down to the latter part of January, 1925, when the Board served a formal offer of $550,000 on the railroad company, consisting of

$460,000 cost of relocation, and $90,000 estimated value of the other property to be taken.   It did not serve on the trust company. A number of conferences were held by the same parties after that, excepting that the attorney for the railroad was absent from one, but they were without result and negotiations came to an end shortly after April 8, 1925.   Thereupon and on April 17, 1925, the Board determined by resolution that the real estate was necessary for the purpose and appropriated same.   Then, pursuant to section 446, it served notice of appropriation on the railroad company.   It did not serve that notice on the trust company, but, later, served the notice and petition in condemnation upon both.   The petition contained a statement or notice of its determination of April 17, 1925, and of the appropriation.   These proceedings followed.   The defense is that plaintiff is without power to take because the property sought is already devoted to a public use and, if not without such power, that it has failed to comply with the prerequisites to condemnation.   Of these, two are the alleged necessity of the consent of the Interstate Commerce Commission, under the claim that the taking will result in interference with interstate commerce, and the necessity of the consent of the proper Federal authorities, as provided by sections 9 and 10 of chapter 425 of the Rivers and Harbors Appropriation Act of March 3, 1899 (30 U. S. Stat. at Large, 1121, 1151), under the claim that the Sacandaga and Hudson are navigable rivers of the United States and may not be obstructed without such consent. The others relate to matters set forth in the Condemnation Law as necessary to be alleged and proved, namely, efforts to agree, service of notice of appropriation and public use.   And the power to take land for the relocation of a part of the State highway is questioned.

### 1. Property Already Devoted to a Public Use.

The Legislature has the power to authorize the taking of land devoted to one public use for a different public use, but the right to take must be expressly given or necessarily implied in the enabling act.   A general grant is not sufficient.   (2 Nichols Em. Dom. [2d ed.] § 361; *Matter of City of New York [Saratoga Avenue]*, 226 N. Y. 128, 135; *N. Y. C. & H. R. R. R. Co.* v. *City of Buffalo*, 200 id. 113, 117, 118; *State of Georgia* v. *City of Chattanooga*, 264 U. S. 472, 480; *Adirondack R. Co.* v. *New York State*, 176 id. 335, 349.)   Here, section 446 gives the Board the power to condemn real estate; section 430, subdivision 1, defines " real estate " as including that " used for railroad, highway, or other public purposes," and section 445 gives the Board a dominant right of

**872** Bd. of Hudson R. Regulating Dist. *v.* F., J. & G. R. R. Co.

Supreme Court, March, 1926. [Vol. 127

eminent domain over the right of eminent domain of public corporations, except cities, with the limitation that, in the exercise of the right, " due care shall be taken to do no unnecessary damage to other public utilities." Thus it is clear that the Legislature contemplated that property devoted to a public use might be taken for another public use. That an extraordinary result may follow at some time, growing out of the fact that the second paragraph of section 431 provides that " any watershed of the state or any integral part of any such watershed may be created into a river regulating district pursuant to the provisions of this article," may not be considered here. It is true the language is broad in scope, but the wisdom of the provision was for the Legislature and is not for the court. Further, the members of the Commission and of the Board are public officers, so that it must be assumed that they will perform their duties in the interest of the public and take only where the public welfare requires. And their determination may be reviewed by certiorari. Fear, on this account, then, seems groundless. Unnecessary damage is claimed. The bottom of the dam is to be at elevation 700 above mean sea level at Sandy Hook. The crest is to be at elevation 771. Between these elevations, 37,800,000,000 cubic feet of water may be impounded. Except for necessary cleaning and repairs, the water is not to be drawn below elevation 740, a little above the elevation of a swamp of 6,000 acres, so as to guard against possible unsanitary conditions from that source, as required by section 468 of the article. That will permit a dead storage of 7,800,000,000 cubic feet and an available storage of 30,000,000,000 cubic feet above. Land is to be taken up to elevation 778. Between elevations 771 and 778, 10.92 acres, or 1,300 feet, longitudinally, of the right of way will be taken. The taking above elevation 771 is for safety and to protect the Board against damages in cases where wave action due to flood might cause the water to rise somewhat above the crest. And the elevation at 740 is to keep the swamp covered when the reservoir is low. Moreover, the determination of the lines was for the Board and reviewable only by certiorari.

## 2. Necessity of the Consent of the Interstate Commerce Commission.

The railroad is engaged in interstate commerce and plaintiff is seeking, by the exercise of the power of eminent domain, to take and hold a portion of its line and property for the purposes of article VII-A of the Conservation Law. The United States Constitution, article I, section 8, clause 3, grants to Congress the power " to regulate commerce * * * among the several States." In

dete.mining questions arising under this grant, two different· principles or rules are applicable.    No State may do anything to impede or interfere with interstate commerce, but States may, under the police power and in the interest of the public health and safety, regulate in certain matters within their respective jurisdictions, until Congress acts, and when Congress does act, its action will supersede conflicting State action.    (*Minnesota Rate Cases*, 230 U. S. 352, 398.) The Act to Regulate Commerce gives the Interstate Commerce Commission exclusive jurisdiction to determine whether or not a railroad shall be permitted to construct a new line or to abandon an existing line.    Section 1, subdivisions 18 to 22, inclusive, of the Interstate Commerce Act (24 U. S. Stat. at Large, 379, as amd. by Transportation Act of 1920 [41 id. 477, 478] § 402) provides that no carrier by railroad subject to the act shall extend its lines, or construct or acquire new lines or extensions or " abandon all or any portion of a line of railroad, or the operation thereof " without first obtaining from the Commission a certificate that the present or future public convenience and necessity permit such abandonment.    This railroad has a main steam line, extending from Fonda, on the line of the New York Central, to the village of Northville, about twenty-five and one-half miles long, and a branch, known as the Broadalbin branch, about seven miles long.    It serves the cities of Johnstown and  Gloversville, the villages of Fonda, Northville, Mayfield, Cranberry Creek and Broadalbin, and some hamlets    Its traffic varies from fourteen trains a day, in both directions, in winter, to eighteen in summer, and is increased somewhat when it is necessary to serve Sacandaga Park, its summer resort.    From Gloversville to Northville, the motive power for the regular passenger service· is a gasoline railroad motor.    For freight, the service is by mixed train, consisting of one passenger and three or four freight cars, hauled by a steam locomotive.    The roadbed has been in use for some time.    In 1923 the gross revenue at Cranberry Creek was $5,915, and at Northville, from the station, $59,724. Receipts for other stations and for other periods were not given. Revenue is not allocated to stations.    Plaintiff is seeking to take about seven miles of the main line, in the Mayfield sector, about halfway between Gloversville and Northville  about half a mile at Northville, stations, side tracks, and terminal facilities at Mayfield, Northville and Cranberry Creek, and an area of half  a  mile to· the north.    The portion to be taken may be relocated about a mile and a half to the north    Article VII-A of the Conservation Law relates to the regulation of the flow of streams.    To make such regulation effective, section 445 confers upon a regulating board a dominant right of eminent domain over the right of eminent domain of public

**874** Bd. of Hudson R. Regulating Dist. *v.* F., J. & G. R. R. Co.

Supreme Court, March, 1926. [Vol. 127

corporations, except cities. It does not show a purpose to regulate commerce in any way. (*Davis* v. *Cleveland, C., C. & St. L. R. Co.,* 217 U. S. 157, 176.) The Commerce Act relates to the regulation of commerce and does not show that Congress intended thereby to restrict the exercise by the States of the power of eminent domain. (*Davis Case, supra.*) It does not so restrict. (*State of Georgia* v. *City of Chattanooga* 264 U. S. 472, 479, 480.) There, the State sought, in the Supreme Court of the United States, to enjoin condemnation proceedings instituted by the city in the Tennessee courts, on the ground that the property to be condemned was railroad property, owned by the State and used in interstate commerce, and that condemnation, if permitted, would destroy it. The property was the railroad yard. In granting the motion of the city to dismiss, the court said: " The power of Tennessee, or of Chattanooga as its grantee, to take land for a street is not impaired by the fact that a sister State owns the land for railroad purposes. * * * The power of eminent domain is an attribute of sovereignty, and inheres in every independent State. * * * It is superior to property rights (*Kohl* v. *United States,* 91 U. S. 367, 371) and extends to all property within the jurisdiction of the State,— to lands already devoted to railway use, as well as to other lands within the State. *United States* v. *Gettysburg Electric Ry. Co.,* 160 U. S. 668, 685; *Adirondack Ry. Co.* v. *New York State,* 176 U. S. 335, 346." The *Chattanooga* case is decisive here. The cases (*Kansas Southern R. Co.* v. *Kaw Valley Dist.,* 233 U. S. 75, 77, 79, and *Railroad Commission of California* v. *Southern Pac. Co.,* 264 id. 331, 345) relied upon by defendants, were attempts to regulate under the police power and did not involve the questions of the right to exercise the power of eminent domain. The *Kaw Valley* case related to an order of a State drainage district made pursuant to power given by the State and requiring an interstate carrier to raise bridges over a river, so as to minimize the danger of floods. The opinion (at p. 77) calls attention to the fact that the question of eminent domain was not involved. The *Southern Pacific* case involved an order by the State Railroad Commission to certain interstate roads to construct a union depot in Los Angeles and to remove certain grade crossings. It is significant that this case and the *Chattanooga Case* (*supra*) were decided on the same day. Here, the right of a State to condemn any land within its borders, already devoted to a public use, for another public use, is not questioned, but the claim is made that such right may be exercised only where the State has expressly decided that the latter use is to be paramount to the prior use, and that, even so, the State may not by its own action authorize a taking, which will impair or destroy an instrumentality of interstate

commerce, without the consent of the paramount authority.   The dominant right of eminent domain conferred by section 445 of the Conservation Law is coupled with the injunction that due care shall be taken to do no unnecessary damage to other public utilities.   Plaintiff has planned accordingly.   And it is undisputed that a new right of way may be acquired to take the place of the part to be taken.   The line and the cost are the only questions. But plaintiff has stipulated that the cost may be determined in this proceeding, as one of the elements of damage, to be paid before any railroad property is taken.   Thus, defendants will have reasonable opportunity to relocate.   And the work may be done while the dam and reservoir are being built.   In that way, railroad operations will not be interrupted.   (*St. Louis Southwestern R. Co. v. Miller, etc.*, 197 Fed. 815; affd., 207 id. 338.)   And abandonment will not be the necessary result.   Moreover, if such relocation is new construction, within the meaning of the act, or if abandonment is desired, and if the consent of the Commission is or becomes necessary, it is for defendants to make the application.   Plaintiff may not and it could not make the Commission a party here.   And when such application is made, it will be for the Commission to determine whether abandonment shall be permitted or relocation required.

### 3. Necessity of the Consent of the Proper Federal Authorities.

Sections 9 and 10 of chapter 425 of the act of March 3, 1899 (30 U. S. Stat. at Large, 1121, 1151) are cited as requiring such consent.   Section 9 makes it unlawful " to construct or commence the construction of any   *   *   *   dam   *   *   *   over or in any   *   *   *   navigable river   *   *   *   of the United States, until the consent of Congress   *   *   *   shall have been obtained and until the plans for the same have been submitted to and approved by the Chief of Engineers and by the Secretary of War: *Provided*, That such structures may be built under authority of the legislature of a state across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of War before construction is commenced."   And it provides that such plans, when so approved, may not be changed without the approval of said officials.   Section 10 prohibits the creation of any obstruction, not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States and provides that " it shall not be lawful to build or commence the building of any   *   *   *   structures in any   *   *   *   navigable river, or other water of the United

**876** BD. OF HUDSON R. REGULATING DIST. *v.* F., J. & G. R. R. Co.

Supreme Court, March, 1926. [Vol. 127

States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of War." And it provides that " it shall not be lawful to excavate or fill, or in any manner to alter or modify the * * * condition, or capacity of, * * * the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of War prior to the beginning of the same." So that, if the Sacandaga is a navigable river of the United States, Federal consent is necessary. In determining that question, Federal law must be the guide. ( *U. S.* v. *Holt State Bank,* 270 U. S. 49.) The test is whether the river in its natural state is used or capable of being used as a highway for commerce, over which trade or travel is or may be conducted in the customary modes of trade or travel on water. Further, a river is a navigable water of the United States when it forms by itself, or by its connection with other waters, a continued highway over which commerce is or may be carried with other states or foreign countries in the ordinary modes in which such commerce is conducted by water. And, " Navigability, in the sense of the law, is not destroyed because the watercourse is interrupted by occasional natural obstructions or portages; nor need the navigation be open at all * * * stages of the water." (*Economy L. & P. Co.* v. *U. S.,* 256 U. S. 113; *The Daniel Ball,* 77 id. [10 Wall.] 557, 566; *The Montello,* 87 U. S. [20 Wall.] 430, 440, 443.) Here, navigability is predicated upon legislative acts and upon the limited use by a small steamboat and for floating logs. Chapter 157 of the Laws of 1868, incorporating the Saratoga Boom Company to construct booms and erect piers across the river in the town of Northampton, provides that the act shall not be construed to prevent the passage of rafts along and down the river during the season of navigation. Chapter 653 of the Laws of 1869 relates to the river and its tributaries above the Northampton boom and declares that portion to be a public highway. That is above the part under consideration. And chapter 176 of the Laws of 1882 declares that the river is thereby constituted " a public highway for the purpose of rafting logs, timber and lumber." These acts do not dispose of the Federal question and indicate, if they indicate anything, that the river is not navigable. For seven or eight years a small steamboat ran at times from Conklingville to Batchelorville, a distance of about thirteen miles. A dam was at Conklingville during this period. The navigation was in the pool created thereby. And the boat would get stuck at times, whereupon brackets would be put on the dam and it would slide off. And for thirty years or so before 1915, or

thereabouts, logs were floated down to the large saw mills at Glens Falls and Fort Edward, 1,000,000 a year in the earlier years and 200,000 or less later, but this use was only during the seasons of h'gh water, about two months in a year, and with the aid of lumber jacks and the use of artificial means.   Such use did not make the river navigable under Federal law ( *U. S.* v. *Rio Grande Dam & Irrigation Co.*, 174 U. S. 690, 698), nor even under State law (*Morgan* v. *King*, 35 N. Y. 454, 459; *People ex rel. Western N. Y. & P. R. Co.* v. *State Tax Comm.*, 215 App. Div. 728).   As to the Hudson, no dam or other structure is to be placed therein.   Flood waters are to be impounded in the reservoir, which is to have a capacity of 37,800,000,000 cubic feet, with dead storage of 7,800,000,000 cubic feet.   The difference is to be released according to conditions. Water will be held back in flood time and released in low-water time.   Thus, notwithstanding the requirement for dead storage, the result will be that the flow will be regulated and the navigable capacity of the river w ll be improved    ( *U. S.* v. *Rio Grande Dam & Irrigation Co.*, 174 U. S. 690, 709.)   The Federal Water Power Act of June 10, 1920, subdivision d, section 4, chapter 285 (41 U. S. Stat. at Large, 1063, 1065), does not apply.   That provides for licenses for the purpose of constructing, operating and maintaining dams and reservoirs, among other project works, necessary or convenient for the development and improvement of navigation and power along, from or in any of the navigable waters of the United States.   In other words, it provides a method for doing what is forbidden by the act of March 3, 1899, already discussed.   And what has been said applies here.

### 4. Efforts to Agree and Notice of Appropriation.

The Board was required by section 446 of the Conservation Law (added by Laws of 1915, chap. 662, as amd. by Laws of 1922, chap. 665) to make *bona fide* efforts to agree with the owners upon the compensation and damages to be paid for the property proposed to be taken, in advance of the proceedings to condemn.   Although only a mortgagee, the trust company is an owner for some purposes, within the meaning of the article and of the Condemnation Law.   (Conservation Law, art. VII-A, § 430; Condemnation Law, § 2.)   The claim is that plaintiff made no *bona fide* efforts to agree with the railroad company and no efforts whatsoever with the trust company. The Board commenced to negotiate some time in 1924 with the railroad company.   The attorney and the engineer acted for the company.   Early in September, 1924, it asked that company for a statement of its claim.   On September twelfth the attorney for the company wrote that he was sending such statement and he inclosed

**878** Bd. of Hudson R. Regulating Dist. *v.* F., J. & G. R. R. Co.

Supreme Court, March, 1926. [Vol. 127

a letter, dated September tenth, from the attorneys for the trust company to the Board, to the effect that they had examined the summary of the claims, aggregating $4,193,768, together with the statements on which such summary was based, as prepared by the engineer for the railroad, and approved same. The items were, cost of relocation, $1,439,119, damage due to increased cost of operation, maintenance and loss of revenue, $1,350,293; damage to Sacandaga Park, $1,304,356, and administration, engineering and legal expenses, $100,000. Early in October the engineer and others representing the Board discussed the claim with the attorney, the engineer and others representing the railroad, at the office of the engineer for the railroad in New York city. After some discussion, they adjourned to give the engineer for the Board time for further consideration of the question of relocation. In the latter part of January, 1925, and without further discusssion, the Board served an offer of $550,000 on the railroad company. It did not serve on the trust company. The offer included $460,000, cost of relocation, and $90,000, estimated value of the property to be taken. On February 18, 1925, the same persons, excepting the railroad attorney, conferred in the same office, but were unable to agree. They met again on April 8, 1925, and were unable to agree. And later one of the members of the Board and the railroad attorney conferred at the office of the Board's attorney of record in Albany. The said attorney and the engineer for the Board were present. What took place is in dispute. Those representing the Board testified that the railroad attorney said that an adjustment depended upon the allowance of consequential damages, which in the opinion of the Board could not be allowed, while he denied and testified that the said Board member stated that the Board would not pay one cent more than the amount of the offer. Each charges the other with the responsibility for the failure to agree. At any rate, that ended the conferences. The negotiations had reached a point where it was evident that an agreement with the railroad company was impossible. (*Matter of Prospect Park & Coney Island R. R. Co.*, 67 N. Y. 371, 377; *Matter of Village of Middletown*, 82 id. 196, 200.) The trust company had approved and adopted the claim as prepared and presented, and thus had made itself a party to the negotiations. The claim had not been changed and such approval and adoption had not been withdrawn. The railroad company had the title and the trust company was only a mortgagee. So that, in the situation presented, the Board was not required to continue the negotiations with the trust company. (*Matter of Rochester, Hornellsville & Lackawanna R. R. Co.*, 110 N. Y. 119, 127.) There proof was given of an attempt to settle with the

landowner lessor and its failure. The proof established that the land sought could not be acquired by agreement and that was decided to be sufficient without showing a negotiation with the lessee, who could not give the title and right required. And the cases (*Matter of Boston, Hoosac Tunnel & Western R. Co.*, 79 N. Y. 69, 71, and *Champlain & Sanford R. R. Co.* v. *Ostrander*, 151 App. Div. 752, 755), relied upon by defendants, do not conflict with *Matter of Rochester, Hornellsville & Lackawanna R. R. Co.* (*supra*). In the former all of the negotiations were with the lessee, corresponding with the mortgagee here, and none of them were with the lessor, operating under a perpetual lease and whose position corresponded with that of the Board here. In the latter the owner of the record title did not answer and the defendant claimed that he was the equitable owner and had the right to convey the property sought. It was decided, one judge dissenting, that he was entitled to be treated as an owner. Moreover, a continuance of the negotiations with the trust company would have been futile. That company is only a mortgagee, with bonds aggregating $7,000,000 and secured by mortgages for $8,200,000, upon all of the railroad property, so that an agreement with it would have been ineffective without an agreement with the railroad company. And that the formal offer was not served upon the trust company is not fatal. That failure affects only the question of costs. (*People* v. *Thornton*, 122 App. Div. 287, 288.) Likewise, the failure to serve formal notice of appropriation on the trust company is not fatal. The notice and petition in condemnation were sufficient. Section 446, which we are considering, provides, further, that the Board, in case of inability to agree upon the compensation and damages to be paid, shall " thereupon " serve upon such owners " a notice as hereinafter provided " that the real estate described therein has been appropriated by the Board for the purposes of the article and shall proceed to acquire title thereto under the Condemnation Law. And the next paragraph requires payment for the property before entry and actual taking. The words " as hereinafter provided," relating to the notice, were inserted and the provision requiring payment before entry was added by section 1, chapter 665 of the Laws of 1922, to overcome objections or possible objections to the section as it was before that. (*State Water Supply Commission* v. *Curtis*, 192 N. Y. 319, 327, 328.) But the article does not show what the inserted words relate to and they are without meaning and notice is unnecessary, unless they refer to the provision at the end of the paragraph for acquiring title under the Condemnation Law. That law provides for service of a notice and petition at least eight days before the return day   Here

such service was made about twenty days before. And the petition notified both defendants that " on the 17th day of April,, 1925, the Board by resolution, determined said real estate herein described to be necessary for the purposes of carrying out the provisions of article VII-A of the Conservation Law and appropriated said real estate," and contained a description thereof. The appropriation was after the failure to agree and the notice was in the form prescribed by the section and complied with it, if notice was required. The section does not require service of the notice before service of the petition in condemnation and does not prevent the service of both in one paper, as was the case here.

## 5. PUBLIC USE.

Lands and other property to be taken for the construction, maintenance and operation of a reservoir within a river regulating district, under section 431 of the Conservation Law (added by Laws of 1920, chap. 662, as amd. by Laws of 1916, chap. 584), for the purpose of regulating the flow of streams in such district, when required by the public welfare, including public health and safety, are for public use. (*Board of Black River Regulating District* v. *Ogsbury,* 203 App. Div. 43, 45; affd., 235 N. Y. 600.) The section invests the district board with the powers therein set forth to effect the purpose. Here the Board proposes to build, maintain and operate such a reservoir for such a purpose and has determined that the lands and property herein sought are necessary. The questions of expediency and of necessity were for the Legislature and may not be considered. (*Matter of City of New York [Ely Ave.],* 217 N. Y. 45, 57; *Matter of Public Service Commission,* Id. 61, 67; *Matter of City of Rochester* v. *Holden,* 224 id. 386, 391.) And the only question is whether or not the stated purpose is for a public use; in other words, whether or not regulation as proposed will benefit public health and safety. That is a judicial question. (*Board of Black River Regulating District* v. *Ogsbury, supra; Matter of City of Rochester* v. *Holden, supra,* 390; *Pocantico Water Works Co.* v. *Bird,* 130 N. Y. 249, 258.) Its determination depends upon the extent of the right by the public to the use and not upon the extent to which that right is or may be exercised. (*Bradley* v. *Degnon Contracting Company,* 224 N. Y. 60, 71.) But, in determining it, the court must accept the declared purpose as the real one and may not inquire into the motives. (*Matter of City of New York [Ely Ave.],* 217 N. Y. 45, 59; *McCabe* v. *City of New York,* 213 id. 468; *Waterloo Woolen Mfg. Co.* v. *Shanahan,* 128 id. 345, 359, 360.) In *Matter of City of New York [Ely Ave.]* (*supra*) the judge writing said: " that the courts will not impute to the Legisla-

ture or the discretionary action of municipal bodies clothed with legislative powers other than public motives for their acts; that the presumption that legislative action has been devised and adopted on adequate information and under the influence of correct motives will be applied to the discretionary action of municipal bodies and will preclude all collateral attack." Moreover, that private parties or private interests may be benefited is not fatal, so long as the use intended is not restricted to such parties or interests, but is open to the whole public. (*Matter of Burns*, 155 N. Y. 23, 26; *Kaukauna Water Power Co.* v. *Green Bay & Miss. Canal Co.*, 142 U. S. 254.) The Conservation Law, article VII-A, section 430, subdivision 2, recognizes this, in defining a " regulating reservoir " as a basin for impounding water, formed by a dam built " for the purposes of regulating the flow of a stream or river," including one where there may be, as an incident, the possibility of the utilization of a portion of the water stored thereby, without in any way interfering with the primary purpose, but excluding one built solely for power purposes. A reservoir, the operation of which will permit the incidental use of water for power purposes, without interfering with the primary purpose of regulation, is permitted, but one primarily for power is prohibited. Floods occur and inundate the cities and villages along the river each year. The inundations vary in extent. Property is damaged, business and transportation are affected, families are obliged to leave their homes, and sickness and death, caused by unsanitary conditions, follow. The floods of 1913 and 1922 were particularly disastrous. Conditions of low water produce results almost as bad. In such periods, stagnant pools are formed, disease germs and bacteria are created, the water is polluted and rendered unfit for drinking, where so used, and such pollution makes the operation of the Albany filtration plant dangerous. And epidemics of typhoid, traceable to the conditions, have followed in Albany four times, in recent years. An increase of flow would have remedied the conditions. The situation has been carefully examined and studied by various State authorities and engineers for the last twenty-five years. Now this reservoir is proposed. Lands are to be taken within lines fixed by the Board. In fixing them, flooding requirements and safety were the determining factors. The site is ideal and the proposed dam is of the type suited for regulation. And it must be assumed that it will be operated, primarily, for the public welfare, including public health and safety. Thus it will benefit the public health and safety. And the conclusion would be the same, even if the question of purpose were open for consideration. Defendants claim that power is the main purpose. As proof they point,

among other things, to the activities of the power companies before and after the creation of the district to the plan, including the type of dam and the scheme of operation, and to the facts that power is to be developed and that the power companies are to pay ninety-five per cent of the cost of the improvement. In the first place, a decision that power is the main purpose would involve a determination that the Board is in league with the power companies and unfaithful or will be to its public obligations, but the evidence does not warrant such a conclusion and the presumption is otherwise. Aside from that, the inference is not justified. It is true the power companies have been active and have procured options for and deeds of lands expected to be taken, and have advanced moneys in payment. Probably, what they have done has been in anticipation of power benefits expected to be received and for reasons of economy, since they are to pay ninety-five per cent of the cost. They may be disappointed. In any event, their motives are not the motives of the Board. As to the plan, it already appears that protection from unsanitary conditions, likely to be caused by a swamp, was the reason for elevation 740, with dead storage of 7,800,000,000 cubic feet below, and safety was the reason for the provision for taking up to elevation 778. And in considering the type of dam, which is to be an impounding and not a sluicing dam, in connection with the plan to regulate with reference to flow at Spiers Falls and not with reference to the points where flood damage is to be eliminated or reduced, it is necessary to bear in mind that regulation of stream flow is the purpose here and that flood control is not the only a m. Finally, it is true, power is to be developed and the power companies are to pay ninety-five per cent of the cost of the improvement, but such development is to be incidental only and is authorized by the article. And the assessment is also authorized.

### 6. Relocation of State Highway.

The Board is seeking to condemn a part of the railroad company's right of way at Sacandaga Park, about 2,700 feet in length and varying in width from 35 feet down, above elevation 778, to be used for the relocation of the State highway, where it will be flooded, and for straightening it in other places which are dangerous because of sharp turns. This is not a purpose authorized by the article and the lands thus sought may not be taken in this proceeding.* With that exception, the Board is entitled to the judgment for which it asks. Findings and judgment accordingly.

---

* See Laws of 1926, chap. 683, § 1, adding to Conservation Law, § 446-a. Not applicable to pending proceedings. (See Laws of 1926, chap. 683, § 2.) — [Rep.