## ECONOMY LIGHT & POWER COMPANY *v.* UNITED STATES.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

No. 104.  Argued December 17, 1920.—Decided April 11, 1921.

1. Artificial obstructions subject to abatement by public authority do not render non-navigable in law a stream which in its natural state would be navigable in fact.  P. 118.
2. The authority of Congress to prohibit added obstructions to a navigable stream is not lost by omission to take action in previous cases.  P. 118.
3. The Desplaines River in Illinois which was used from a very early day to about the year 1825 as a link in a well-known route between Lake Michigan and the Mississippi, in the transportation of furs and supplies by canoes and other light-draft boats, but has not since

been used for transportation and is not thus useful under existing conditions, *held* a navigable water of the United States and within the act of Congress forbidding unauthorized obstructions. Act of March 3, 1899, c. 425, § 9, 30 Stat. 1151.  Pp. 117, 123.

4.  The public interest in navigable streams of this character in Illinois and neighboring States, and the federal authority over such as are capable of serving interstate commerce, arises not from custom or implication, but from the declaration of the 4th Article of the compact in the Ordinance of July 13, 1787, for the government of the Northwest Territory, that the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, etc.,—a principle which was reiterated in later acts of Congress and accepted by Illinois in her constitution at the time of her admission as a State.  P. 118.

5.  In so far as the Ordinance of 1787 thus established public rights of highway in navigable waters capable of bearing commerce from State to State, it was no more subject to repeal by a State than any other regulation of interstate commerce enacted by Congress.  P. 120.

6.  The power of the States to regulate such navigable waters is plenary within their borders until Congress intervenes, but Congress has the power to assume entire control whenever it chooses, unhampered by previous acts of the States, and this supreme authority applies to States formed out of the Northwest Territory as well as to others, and may be exercised through general as well as special laws.  P. 121.

7.  A river may be navigable in law though it contain natural obstructions and though it be not open to navigation at all seasons or at all stages of water.  P. 121.

8.  A decision of a state Supreme Court holding a river not navigable in its natural condition does not bind the United States if it was not a party to the suit.  P. 123.

9.  A river having actual navigable capacity in its natural state and capable of carrying commerce among the States is within the power of Congress to preserve for purposes of future transportation, even though it be not at present used for such commerce and be incapable of such use according to present methods, either by reason of changed conditions or because of artificial obstructions.  P. 123.

10.  The provisions of § 9 of the Act of March 3, 1899, *supra*, applicable in terms to "*any* navigable river or other navigable water of the United States," cannot be limited to such waters as were at the date of the act, or as now are, actually open to use.  P. 123.

11.  Where there was no application under the statute, but the party

desiring to build a dam merely submitted its plans to the Secretary of War at an informal hearing and assured him that the stream was not navigable, *held* that his refusal to act, upon the ground that that condition left the stream without his jurisdiction, imported neither an approval of the project nor an inquiry concerning navigability.   P. 124.

256 Fed. Rep. 792, affirmed.

THE case is stated in the opinion.

*Mr. Frank H. Scott* for appellant.

*Mr. Clarence N. Goodwin,* Special Assistant to the Attorney General, with whom *The Solicitor General* was on the brief, for the United States.

MR. JUSTICE PITNEY delivered the opinion of the court.

This was a suit brought by the United States against appellant in the District Court for the Northern District of Illinois, Eastern Division, for an injunction to restrain defendant from constructing a dam in the Desplaines River at a point in Grundy County, Illinois, without the consent of Congress or authority of the legislature of the State, and without approval of the location and plans by the Chief of Engineers and the Secretary of War of the United States. Relief was prayed upon two grounds: (1) that the river bed where the dam was being constructed was the property of the United States; (2) that the Desplaines River was a navigable waterway of the United States, and the proposed construction of a dam therein was in violation of the Act of Congress of March 3, 1899, c. 425, § 9, 30 Stat. 1121, 1151. The first ground was overruled by the District Court and disregarded by the Circuit Court of Appeals. We need not consider it further. The second ground was sustained by the District Court, and its final decree granting an injunction was

affirmed by the Circuit Court of Appeals, 256 Fed. Rep. 792.  The present appeal followed.

Section 7 of Act of September 19, 1890, c. 907, 26 Stat. 426, 454, makes it unlawful to build any dam or other structure in any navigable river or other waters of the United States, so as to obstruct or impair navigation, without permission of the Secretary of War.  Section 9 of the Act of March 3, 1899 (30 Stat. 1151) declares: "That it shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any  .  .  .  navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of War: *Provided,* That such structures may be built under authority of the legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of War before construction is commenced.  .  .  ."

There is no contention that the consent of Congress for the building of the proposed dam has been obtained, that its construction has been authorized by the legislature of the State of Illinois, or that the location and plans have been submitted to and approved by the Chief of Engineers and the Secretary of War.  The substantial defense is that the Desplaines River, at the site of the proposed dam, which is below the City of Joliet and just above the point where the Desplaines joins the Kankakee to form the Illinois River, is not navigable in fact and not within the description "navigable river, or other navigable water of the United States," as employed in the Act of 1899.

The District Court found that there was no evidence of actual navigation within the memory of living men, and that there would be no present interference with navigation by the building of the proposed dam. The Circuit Court of Appeals did not disturb this finding. 256 Fed. Rep. 792, 798. But both courts found that in its natural state the river was navigable in fact, and that it was actually used for the purposes of navigation and trading in the customary way, and with the kinds of craft ordinarily in use for that purpose on rivers of the United States, from early fur-trading days (about 1675) down to the end of the first quarter of the nineteenth century. Details are given in the opinion of the Circuit Court of Appeals, and need not be repeated. Suffice it to say that there was a well-known route by water, called the Chicago-Desplaines-Illinois route, running up the Chicago River from its mouth on Lake Michigan to a point on the west fork of the south branch; thence westerly by water or portage, according to the season, to Mud Lake, about 2 miles; thence to the Desplaines near Riverside, 2 miles; thence down the Desplaines to the confluence of that river with the Kankakee, where they form the Illinois River; thence down the Illinois to its junction with the Mississippi. During the period mentioned the fur trade was a leading branch of commerce in the western territory, and it was regularly conducted upon the Desplaines River. Supplies in large quantity and variety, needed by the early settlers, also were transported over this route between Chicago and St. Louis and other points. Canoes and other boats of various kinds were employed, having light draft but capable of carrying several tons each, and manned by crews of six or eight men. The route was navigated by the American Fur Company regularly during a period of years down to about 1825, after which it was disused because the trade had receded to interior portions of Illinois that could be reached

more conveniently with horses.  Later, changes occurred
in the river, due to the drainage of a swamp in the region
of the portage, the clearing away of forests affecting the
rainfall and the distribution of the run-off, and thus
shortening the duration of the higher stages of water;
the construction (under state authority) of the Illinois
and Michigan Canal in 1848 and its deepening in 1866
to 1871, which diverted a part of the hill drainage towards
the Chicago River; and the construction of the Sanitary
and Ship Canal in 1892 to 1894.

But, in spite of these changes, the Circuit Court of
Appeals finds (256 Fed. Rep. 804) that the Desplaines
River is a continuous stretch of water from Riverside
(at the Chicago divide) to its mouth; and although there
is a rapid, and in places shallow water, with boulders
and obstructions, yet these things do not affect its navi-
gable capacity; that the same is true of the upper part of
the Illinois River above the head of steamboat naviga-
tion; and that both streams are navigable and are within
the Act of 1899.

Since about the year 1835 a number of dams have been
built in the Desplaines, without authority from the United
States, and one or more of them still remain; besides, a
considerable number of bridges of various kinds span the
river.   The fact, however, that artificial obstructions
exist capable of being abated by due exercise of the public
authority, does not prevent the stream from being re-
garded as navigable in law, if, supposing them to be
abated, it be navigable in fact in its natural state.   The
authority of Congress to prohibit added obstructions is
not taken away by the fact that it has omitted to take
action in previous cases.

The public interest in navigable streams of this char-
acter in Illinois and neighboring States, and the federal
authority over such as are capable of serving commerce
among the States, does not arise from custom or implica-

tion, but has a very definite origin. By Article 4 of the compact in the Ordinance of July 13, 1787, for the government of the territory northwest of the river Ohio, it was declared: "The navigable waters leading into the Mississippi and Saint Lawrence, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of the said territory, as to the citizens of the United States, and those of any other States that may be admitted into the confederacy, without any tax, impost, or duty therefor." 1 Stat. 51, 52, note; Rev. Stats. U. S., 1878 ed., pp. 13, 16. This was under the Confederation; but the first Congress under the new Constitution expressed a design to have it continue in full effect, in the Act of August 7, 1789, c. 8, 1 Stat. 50. A purpose to preserve the rights of public highway in the navigable rivers was again manifested in § 9 of Act of May 18, 1796, c. 29, 1 Stat. 464, 468. The Territory of Indiana (including what is now Illinois) was set apart and organized by Act of May 7, 1800, which in § 2 reiterated that purpose, (c. 41, 2 Stat. 58, 59); and in an act providing for the disposal of the public lands therein (Act of March 26, 1804, c. 35, § 6, 2 Stat. 277, 279–280), it was again declared "that all the navigable rivers, creeks and waters, within the Indiana territory, shall be deemed to be and remain public highways." Illinois was set apart and a separate territorial government established therein by Act of February 3, 1809, c. 13, 2 Stat. 514. By § 2, the government was to be "in all respects similar" to that provided by the Ordinance of 1787 and the Act of August 7, 1789, and the inhabitants were to enjoy all the rights, privileges, and conditions granted by the Ordinance. An Act to enable the people of Illinois to form a state government, approved April 18, 1818, c. 67, 3 Stat. 428, contained a proviso (§ 4, p. 430) that such government should not be repugnant to the Ordinance of 1787. The state constitution declared its purpose to

be consistent with the Ordinance, and the resolution of Congress declaring admission of the State into the Union (December 3, 1818, 3 Stat. 536) acknowledged that the constitution and state government were "in conformity to the principles of the articles of compact" in the Ordinance of 1787.

There can be no doubt that the waters of the Chicago-Desplaines-Illinois route "and the carrying places between the same" constituted one of the routes of commerce intended by the Ordinance, and the subsequent acts referred to, to be maintained as common highways. It did not make them navigable in law unless they were navigable in fact, but declared the public rights therein so far as they were navigable in fact; and it is curious and interesting that the importance of these inland waterways, and the inappropriateness of the tidal test in defining our navigable waters, was thus recognized by the Congress of the Confederation more than 80 years before this court decided *The Daniel Ball,* 10 Wall. 557, 563, and more than 60 years before *The Propeller Genesee Chief* v. *Fitzhugh,* 12 How. 443, 455.

To the extent that it pertained to internal affairs, the Ordinance of 1787—notwithstanding its contractual form—was no more than a regulation of territory belonging to the United States, and was superseded by the admission of the State of Illinois into the Union "on an equal footing with the original States in all respects whatever." *Permoli* v. *First Municipality,* 3 How. 589, 610; *Van Brocklin* v. *Tennessee,* 117 U. S. 151, 159; *Hawkins* v. *Bleakly,* 243 U. S. 210, 217. But, so far as it established public rights of highway in navigable waters capable of bearing commerce from State to State, it did not regulate internal affairs alone, and was no more capable of repeal by one of the States than any other regulation of interstate commerce enacted by the Congress; being analogous in this respect to legislation enacted under the exclusive power

of Congress to regulate commerce with the Indian tribes. *Pollard's Lessee* v. *Hagan,* 3 How. 212, 229–230; *Ex parte Webb,* 225 U. S. 663, 683, 690–691; *United States* v. *Sandoval,* 231 U. S. 28, 38.

Nothing inconsistent with this was decided in *Escanaba Co.* v. *Chicago,* 107 U. S. 678, 688–689; *Huse* v. *Glover,* 119 U. S. 543, 546; *Sands* v. *Manistee River Improvement Co.,* 123 U. S. 288, 295, 296; *Willamette Iron Bridge Co.* v. *Hatch,* 125 U. S. 1, 8–11. Those cases simply hold, in effect, that a State formed out of a part of the Northwest Territory has the same power to regulate navigable waters within its borders that is possessed by other States of the Union; that is to say, until Congress intervenes, the power of the State, locally exerted, is plenary; nevertheless, where the navigation serves commerce among the States or with foreign nations, Congress has the supreme power when it chooses to act, and is not prevented, by anything the States may have done, from assuming entire control in the matter. In short, that the rule laid down in *Willson* v. *Black-bird Creek Marsh Co.,* 2 Pet. 245, 252, and *Gilman* v. *Philadelphia,* 3 Wall. 713, 731, applies to States formed out of the Northwest Territory as well as to others. This is not questioned. But, as was recognized in the *Gilman Case* (p. 731), Congress may exercise its authority through general as well as through special laws, its power in either case being supreme. The Act of 1899 (30 Stat. 1151), upon which the present bill is founded, is a due assertion of the authority of Congress over all navigable waters within its jurisdiction; and it must be accorded due weight as such.

The Circuit Court of Appeals, in passing upon the question of navigability, correctly applied the test laid down by this court in *The Daniel Ball,* 10 Wall. 557, 563; and *The Montello,* 20 Wall. 430, 440–443; that is, the test whether the river, in its natural state, is used, or capable of being used as a highway for commerce, over which

trade and travel is or may be conducted in the customary modes of trade and travel on water. Navigability, in the sense of the law, is not destroyed because the watercourse is interrupted by occasional natural obstructions or portages; nor need the navigation be open at all seasons of the year, or at all stages of the water.

In *The Montello, supra,* the question was whether Fox River, in the State of Wisconsin, was a navigable water of the United States within the meaning of acts of Congress. Originally there were rapids and falls in the river, but these had been obviated by locks, canals, and dams, so as to furnish an uninterrupted water communication for steam vessels of a considerable capacity. It was argued (p. 440) that although since these improvements the river might be considered as a highway for commerce conducted in the ordinary modes, it was not so in its natural state, and therefore not navigable under the decision in *The Daniel Ball, supra.* The court, accepting navigability in the natural state of the river as the correct test, proceeded to show that, before the improvements resulting in an unbroken navigation, and when a few portages were necessary, a large and successful interstate commerce had been carried through the river by means of Durham boats; and, speaking by Mr. Justice Davis, proceeded to say (p. 441) that, even aside from the Ordinance of 1787, "the true test of the navigability of a stream does not depend on the mode by which commerce is, or may be, conducted, nor the difficulties attending navigation. If this were so, the public would be deprived of the use of many of the large rivers of the country over which rafts of lumber of great value are constantly taken to market. It would be a narrow rule to hold that in this country, unless a river was capable of being navigated by steam or sail vessels, it could not be treated as a public highway. The capability of use by the public for purposes of transportation and commerce affords the true criterion of the

navigability of a river, rather than the extent and manner of that use.   If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway." Proceeding to say (p. 442) that notwithstanding the fact that before the improvements there were obstructions to an unbroken navigation, which rendered the navigation difficult and prevented the adoption of modern agencies, commerce was successfully carried on, the court pointed out (p. 442) that the Ordinance of 1787 recognized "carrying-places" as a part of a navigable waterway.

Our attention is called to the fact that in *People* v. *Economy Power Co.*, 241 Illinois, 290, 320–338, the Supreme Court of Illinois held that the Desplaines in its natural condition is not a navigable stream; and it is intimated that we ought to follow that decision.   A writ of error brought to review it was dismissed by us because no federal question was involved (234 U. S. 497, 510, 524). Of course, the decision does not render the matter *res judicata,* as the United States was not a party.   The District Court in the present case treated it as not persuasive, because it appeared that evidence was wanting which is present here; and we cannot say that the court below erred in not following it.

We concur in the opinion of the Circuit Court of Appeals that a river having actual navigable capacity in its natural state and capable of carrying commerce among the States, is within the power of Congress to preserve for purposes of future transportation, even though it be not at present used for such commerce, and be incapable of such use according to present methods, either by reason of changed conditions or because of artificial obstructions. And we agree that the provisions of § 9 of the Act of 1899 (30 Stat. 1151) apply to such a stream.   The act in terms applies to "*any* . . . navigable river, or other

navigable water of the United States"; and, without
doing violence to its manifest purpose, we cannot limit
its prohibition to such navigable waters as were, at the
time of its passage, or now are, actually open for use.
The Desplaines River, after being of practical service as a
highway of commerce for a century and a half, fell into
disuse, partly through changes in the course of trade or
methods of navigation, or changes in its own condition,
partly as the result of artificial obstructions. In conse-
quence, it has been out of use for a hundred years; but a
hundred years is a brief space in the life of a nation; im-
provements in the methods of water transportation or
increased cost in other methods of transportation may
restore the usefulness of this stream; since it is a natural
interstate waterway, it is within the power of Congress to
improve it at the public expense; and it is not difficult to
believe that many other streams are in like condition and
require only the exertion of federal control to make them
again important avenues of commerce among the States.
If they are to be abandoned, it is for Congress, not the
courts, so to declare. The policy of Congress is clearly
evidenced in the Act of 1899, and, in the present case at
least, nothing remains but to give effect to it.

It is contended that, supposing the Desplaines is naviga-
ble, the purpose of the Act of 1899 was in effect accom-
plished because appellant or its predecessor, before pro-
ceeding with the enterprise, submitted the plans for the
proposed dam to the War Department, and that Depart-
ment "in substance gave its approval," although it did
not formally approve the plans because it did not con-
sider the Desplaines River a navigable water of the United
States. It appears, however, that there was no applica-
tion for an approval under the Act of 1899; and the
Department was not called upon to exercise its jurisdic-
tion under that act. There was an informal hearing
before the Secretary, at which the representatives of

appellant, assuring him that the Desplaines was not a navigable stream either in law or in fact, and that the Department had no jurisdiction over it, asked not for a permit, but in effect for an assurance that no permit was necessary. The Secretary declined to act because, as the river was not navigable, he had no jurisdiction. We cannot regard this as equivalent to an approval, either in form or effect, or even as an official inquiry into the navigability of the river.

*Decree affirmed.*

MR. JUSTICE MCREYNOLDS took no part in the consideration or decision of this case.