Mrs. George W. INGRAM, Jr.

v.

ASSOCIATED PIPELINE CONTRACTORS, INC., the Travelers Insurance Company, Robishaw Engineering, Inc., Flexifloat International, Inc. and the Belmas Company, Inc.

Civ. A. No. 3049.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

April 21, 1965.

A. G. Seale, Seale, Hayes, Smith & Baine, Baton Rouge, La., for plaintiff.

Tom F. Phillips, Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, La., for Associated Pipeline Contractors, Inc., and Travelers Ins. Co.

E. Leland Richardson, Dale, Richardson & Dale, Baton Rouge, La., for Flexifloat International, Inc., Robishaw Engineering, Inc., and Travelers Ins., Co., as insurer of Robishaw Engineering, Inc.

Wallace A. Hunter, Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, La., for Belmas Company.

WEST, District Judge:

This matter is before the Court on motion of defendants, Associated Pipeline Contractors, Inc., and its liability insurer, Travelers Insurance Company, to

dismiss as to them for failure to state a claim upon which relief can be granted. The motion is based upon the alleged grounds that (1) the accident which claimed the life of George W. Ingram, Jr. did not occur upon a navigable stream of the United States within the meaning of applicable statutes and the general maritime law, and that (2) the decedent, George W. Ingram, Jr., was not, at the time of his death, a member of the crew of a vessel in navigation within the meaning or intendment of the Jones Act (46 U. S.C.A. § 688). Since the Court has permitted both parties to submit affidavits and discovery depositions in support of and in opposition to this motion, the motion will, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, be considered as a motion for summary judgment.

The uncontroverted facts show that the accident in which Ingram was killed occurred on May 13, 1964, while he was employed by defendant, Associated Pipeline Contractors, Inc., as a welder's helper. Associated was in the process of laying a pipeline across False Bayou, which is a landlocked bayou lying between the northern end of False River and the Mississippi River about six miles east of New Roads, Louisiana. False Bayou is separated from False River by State Highway 413, the Texas-Pacific Railway, and some open farm and pasture land. It is separated from the Mississippi River by State Highway 415 and the Mississippi River levee. It is cluttered with trees, water hyacinths and other vegetation growing therein, and it is not, in fact, navigable even by the smallest outboard motor boat. It is approximately three miles long, completely landlocked, and contains practically no open water. There is simply no question but that this body of water is not now navigable in fact within any accepted definition of that term. But plaintiff contends that in the year 1839, the Supreme Court of Louisiana held, in the case of Sicard v. Chitz, et al, 13 La. 111, that this body of water was navigable, and that consequently, when a waterway is once found

to be navigable, it forever remains navigable. In support of this contention, plaintiff cites United States v. Appalachian Electric Power Company, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940), and Loc-Wood Boat and Motors, Inc. v. Rockwell, 145 F.Supp. 848 (W.D.Mo. 1956), aff. 245 F.2d 306 (8th Cir. 1957). Neither these cases nor the other cases cited by plaintiff are, however, determinative of the question of navigability in this case. First of all, while in the Appalachian case the Court concluded that the New River was navigable, it specifically stated:

"We do not purport now to lay down any single definitive test. We draw from the prior decisions in this field and apply them, with due regard to the dynamic nature of the problem, to the particular circumstances presented by the New River. * * * In determining the navigable character of the New River it is proper to consider the feasibility of interstate use after reasonable improvements which might be made."

The Court then proceeded to consider in detail all of the various factors pertaining to the navigability of that particular river and finally concluded that New River was, in fact, a navigable stream. The characteristics of that river bear no resemblance whatsoever to the characteristics of False Bayou, and hence the factual situations are in no way analogous.

Secondly, in the Loc-Wood case the Court specifically found that even though the damming of the Osage River prevented boats from operating "freely up and down the Osage River", nevertheless, the river remains "under the control of the Department of Commerce, which licenses boats and vessels operating upon the Lake of the Ozarks. Such boats and vessels are also subject to inspection as to seaworthiness by the United States Coast Guard." In contrast to this, insofar at least as the operations and responsibility of the United States Coast Guard is concerned, False *River* has been specifically declared to be a non-navi-

**6**

gable waterway. See 33 U.S.C.A. §§ 2.99–1, 2.99–100. False *River* is a rather large body of water which at one time was the actual bed of the Mississippi River. As the Mississippi River changed its course, False *River* became a landlocked body of water, completely isolated by levees, farm land, roads, etc. from the Mississippi River. It is now more like a large lake than a river and is a haven for sportsmen engaged in boating, water skiing, fishing, etc. If False *River* is nonnavigable, then a fortiori, False *Bayou* must also be non-navigable. And thirdly, False Bayou was not declared in Sicard to be a navigable stream. It was False *River* that was involved in that case.

■ The early case of The Daniel Ball, 10 Wall. 557, 19 L.Ed. 999 (1871) laid down the basic test of navigability. This test was stated to be as follows:

"Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water."

This is still the general test today. But as stated in Appalachian, the Court has never attempted to lay down any inflexible, definitive test of navigability. Each case must rest upon its own peculiar facts and circumstances. In Economy Light and Power Co. v. United States, 256 U.S. 113, 118, 121, 122, 41 S.Ct. 409, 411, 412, 65 L.Ed. 847 (1921), the Court stated:

"The fact, however, that artificial obstructions exist capable of being abated by due exercise of the public authority, does not prevent the stream from being regarded as navigable in law, if, supposing them to be abated, it be navigable in fact in its natural state. * * * the test is whether the river, in its natural state is used, or capable of being used as a highway for commerce,

over which trade and travel is or may be conducted in the customary modes of trade and travel on water."

Applying these tests to the present case, we must inevitably conclude that False Bayou is not, in fact or in law, a navigable stream. At the time of Sicard, in 1839, False River was apparently an important water highway serving a large settlement in Pointe Coupee Parish. False River was at one time the main channel of the Mississippi River. At the time of Sicard, the Mississippi River had changed its course, and while False River was no longer the main channel of the River, it did, nevertheless, directly connect with the Mississippi River. One end of False River was, at that time, apparently somewhat obstructed, but the other end of False River did connect directly with the Mississippi River and did form a means of communication between the settlement in Pointe Coupee Parish and the Mississippi River itself. The Court found that False *River* was, in fact, a navigable stream at that time. It did not find that False *Bayou* was navigable. False Bayou was in no way involved in that litigation.

■ There is simply no evidence in this record to even indicate that False Bayou was ever navigable, much less being navigable today. But there is ample evidence to indicate that not only is False Bayou not navigable, but also that False River itself can no longer be considered a navigable stream. The facts of this case leave little doubt that the obstrutions to the navigability of both False River and False Bayou could not be abated by any reasonable exercise of public authority. Hence, this Court concludes that False Bayou is not, in fact or in law, a navigable waterway.

■ But even had this Court concluded that False Bayou was a navigable waterway, it would be forced to conclude that the deceased, George W. Ingram, Jr., was not a member of a crew aboard a vessel at the time of his death.

At the time of the accident involved Ingram was employed by Associated

Pipeline Contractors, Inc. He had been hired through the union as a welder's helper, the purpose of his employment being to assist the welder to whom he was assigned in welding joints on a pipeline to be laid by Associated. Up until the time of the accident which claimed his life, he had been working on sections of the pipe in the equipment yard some distance from False Bayou. In the process of laying the section of the pipeline which was to cross False Bayou, Associated used barges known as Flexifloats. Four or five of these barges, or Flexifloats, were to be hooked together with couplings to form a sort of platform from which workers could work in laying the pipeline. One of these barges was designated the J-13. About fifteen minutes prior to the happening of this accident, Ingram and the welder to whom he was assigned were called from the equipment yard to assist in mounting a spud engine on one of the barges which was to be hooked up with the J-13 and the other barges involved. Spuds are steel pipes about 30 feet in length and about 10 inches in diameter that go through the bottom of the barges and can be lowered beneath the water and into the ground so that the barges might be held stationary at a designated place. The spud engine is used to raise and lower the spuds. When the spuds are raised, the group of barges connected together are then moved by use of a dragline mounted on one of the barges. In the course of mounting the spud engine, it was necessary to weld a cleat on the J-13. About fifteen minutes after Ingram arrived at the location of the barges, he started to weld the cleat onto the J-13 when, for some reason or other, the barge exploded, causing his death. Plaintiff now contends that Ingram was a member of the crew of the vessel J-13 at the time of his death, and that thus, his survivors are entitled to the remedies provided by the Jones Act.

The testimony taken in this case reveals that when the explosion occurred, the J-13 was "in the slough, tied up at the bank, with one end on the bank and the other end in the water." The J-13 had been brought from the equipment yard on a truck and was then pulled from the truck into the slough by a tractor and finally installed in the water by a dragline. The decedent had nothing whatsoever to do with loading or unloading the J-13 or installing it in the water or hooking it up. The following testimony is found in the deposition of Mr. E. D. Singleton, Associated's superintendent on this job:

"Q. Do you know whether or not it was intended that Mr. Ingram would have worked on the J-13 after it was put to use?

"A. No, he would not have.

"Q. * * * was it intended that he would have worked on any equipment that would have been floated on the J-13 after it had been put to use?

"A. No, he wouldn't—he would not have.

"Q. Was Mr. Ingram permanently attached to the J-13 as a crew member?

"A. He was not.

"Q. Prior to May 13, 1964, had Mr. Ingram worked on this— any Flexifloat which might have been floated on this slough?

"A. No, he did not.

"Q. Was it expected that he would have done any additional work on the J-13 or any other Flexifloat after this one welding job was complete?

"A. No, he would not have.

"Q. How long do you consider it would have taken the welder and Mr. Ingram to complete the job to which they were assigned?

"A. Thirty minutes."

It is further significant to note that at the time of this accident, Associated had forty-two or forty-three welders on their payroll, any one of whom, together

**8**

with his helper, could have been called to do this job instead of Ingram.

Plaintiff argues that the question of seaman status is a factual issue which must be presented to the jury for determination. While ordinarily the question of whether or not a person is a seaman for purpose of the Jones Act is a question for jury determination, nevertheless, such is not always the case. If there is no material issue of fact involved, summary judgment is then just as applicable to the question of seaman status as it is to any other type of factual situation. This Court concludes that the cases of Rotolo v. Halliburton Co., 317 F.2d 9 (CA5 1963) and Thibodeaux v. J. R. McDermott & Co., 276 F.2d 42 (CA5 1960), are determinative of this issue. There being no material issue of fact involved insofar as the status of decedent at the time of his death is concerned, it is concluded that the decedent, George W. Ingram, Jr., was not a seaman at the time of his death as contemplated by the Jones Act, and that Associated Pipeline Contractors, Inc. and their liability insurer, Travelers Insurance Company, are thus entitled to a summary judgment as prayed for.

Judgment will be entered accordingly.