**The MIAMI VALLEY CONSERVANCY DISTRICT, Plaintiff,**

v.

**Clifford L. ALEXANDER et al., Defendants.**

**Civ. No. C–1–79–336.**

United States District Court, S. D. Ohio, W. D.

Feb. 20, 1981.

Arthur A. Ames, Dayton, Ohio, for plaintiff.

Ann Marie Tracey, Asst. U. S. Atty., Cincinnati, Ohio, for defendants.

## FINDINGS OF FACT, OPINION, AND CONCLUSIONS OF LAW

CARL B. RUBIN, Chief Judge.

This matter was tried to the Court on December 1 and 2, 1980. Testimony and evidence[1] were received at that time.

This case concerns the efforts of the United States Corps of Engineers to declare that the following are navigable streams within the meaning of Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403:

a. The Great Miami River from its mouth to mile 153.5 S.R. 274 crossing in Logan County;

b. Loramie Creek from its mouth to mile 20.8 Loramie Portage;

c. Stillwater River from its mouth to mile 33.0 confluence with Greenville Creek;

d. Greenville Creek from its mouth to mile 23.6 Daly Road crossing upstream of the City of Greenville;

e. Mad River from its mouth to mile 26.2 confluence with Buck Creek near Springfield, Ohio.

Plaintiff, the Miami Conservancy District, created by the General Assembly of Ohio in 1914, and Intervenors who are municipal corporations located along the Great Miami River and its tributaries have

---

1. In addition to the foregoing the Court made certain inquiries of its own. Briefs in the case of *Koehne v. City of Dayton*, 97 Ohio St. 341, 119 N.E. 651 (1917), were obtained from the Clerk of the Supreme Court of Ohio. The *Koehne* case involved a finding by the Supreme Court of Ohio in 1917 that the Great Miami River at Dayton, Ohio was not a navigable stream. In view of the holding in *Economy Light Co. v. United States*, 256 U.S. 113, 65 L.Ed. 847, 41 S.Ct.409 (1920):

A decision of a state Supreme Court holding a river not navigable in its natural condition does not bind the United States if it was not a party to the suit.

*Koehne v. City of Dayton* has been disregarded. The briefs contain no information useful in the determination of this matter. They were made available to counsel for examination.

In an effort to fill in gaps in plaintiff's Exhibit 4, which is a series of maps showing the location of the Miami Erie Canal, the Court sought the assistance of the Cincinnati Historical Society. No information was obtained that became any part of the findings of fact herein.

brought an action for declaratory judgment. The sole issue before the Court concerns navigability of the Great Miami River and its tributaries based upon historical use only. It is agreed by the parties that no use of these waterways for commercial purposes occurred after 1830.

In accordance with Rule 52 of the Federal Rules of Civil Procedure the Court does submit its Findings of Fact, Opinion and Conclusions of Law.

## I.

## FINDINGS OF FACT

### 1. *Geography*

The terrain of southwestern Ohio may be described as rolling or hilly. From the Ohio River on the south and for a distance of some 150 miles to the north all rivers flow in a southerly direction and ultimately empty into the Ohio River. Near the center of the state, a divide occurs whereby north thereof the rivers flow northwardly to Lake Erie and south thereof they flow southwardly into the Ohio River. The Great Miami River is located in the western portion of Ohio. It flows southwestwardly following a valley which includes the cities of Hamilton, Middletown, and Dayton. The river passes through extensive gravel deposits which affect the characteristics of the riverbed. North of the City of Dayton the Great Miami River is joined by two of its tributaries; the Mad River, which flows into the Great Miami River from the northeast and the Stillwater River, which flows approximately from the north. Loramie Creek and Greenville Creek, the other streams involved herein are tributaries of the Stillwater River.

At the Ohio River and for some miles northwardly, the Great Miami River Valley is paralleled on the east by the Millcreek Valley. The Millcreek is a substantially smaller stream and is significant in this matter only because its valley became the situs of the southerly portion of the Miami Erie Canal. The two valleys are separated by a ridge of hills and the two streams do not join at any point.[2]

### 2. *Presettlement Use*

While accurate records do not exist, there is an agreement among historians that during the early and middle part of the Eighteenth Century the Miami River Valley and the Maumee River Valley to the north were used to some extent by fur traders from Canada and by the Miami Indians who inhabited the area. There is equal evidence to indicate that an Indian village known as "Pickawillamy" and located near the present City of Piqua was a center of fur trading and probably a collection point. Fur pelts, however, may equally have been brought to Pickawillamy overland by trails leading east and west, as from the Great Miami River and its various tributaries. Other than the fur trade, no evidence of any commercial use of these waters was presented. Commercial use began near the beginning of the Nineteenth Century and the gradual settlement of southwestern Ohio.

### 3. *Military Campaigns*

The presence of the Miami Indians inhibited the settlement of this area. Despite pressures for the acquisition of farm land following the Revolutionary War, the subduing of the Indians was necessary before inland settlement could take place.

The military campaigns in the area of Southwestern Ohio covered the period from 1787 when the Northwest Ordinance opened the land for settlement to 1794 when the Battle of Fallen Timbers effectively ended Indian resistance. During the campaigns expeditions had been sent from Cincinnati which proceeded both overland and up the Great Miami River to Dayton and beyond

---

**2.** Defendant's Exhibit E–1 seems to indicate that the Millcreek joins the Great Miami River at approximately the Ohio River. While the accuracy of this exhibit has not been questioned, the court takes judicial notice that the Millcreek enters the Ohio River within the corporate limits of the City of Cincinnati, some fifteen miles east of the mouth of the Great Miami River.

Dayton up the Great Miami River and its tributaries. Evidence was presented to the Court that on a few occasions flatboats were brought upstream with the assistance of military personnel. Such use was accomplished only through the use of large numbers of soldiers. Testimony was presented that in one instance the upstream use of a flatboat required the efforts of thirty-two men. Aside from the occasional use by the military during the period in question under such conditions, no evidence was presented to the Court of any significant use of the river or its tributaries at any time on an upstream basis.

### 4. Commercial Use, 1800-1830

During the first thirty years of the Nineteenth Century, commercial water transportation was limited to flatboats, keelboats, steamboats and tow boats.

### A. Flatboats

Flatboats were essentially rafts with some side boards thereon. They were used to float cargo down the Great Miami River to the Ohio and then down the Ohio and the Mississippi to New Orleans. At New Orleans the flatboats were dismantled and sold as lumber. Flatboats were used on one occasion for upstream purposes in the settlement of Dayton. It should be pointed out, however, that while the flatboats transported only thirteen of the settlers, forty-seven others proceeded overland from Cincinnati to Dayton. The flatboat use during the period in question was at best sporadic, limited to periods of high water, and only on a seasonal basis. Only in sixteen of the thirty years between 1800 and 1830 were uses of flatboats noted. In fourteen of the sixteen years the evidence disclosed that the use was limited to the months of April and May.

The use of the river by flatboats varied substantially. In 1825, seventy-nine flat-

boats were observed by a newspaper. In four years, 1800, 1809, 1811 and 1821, only one flatboat use was noted and in two instances, 1811 and 1821, the one flatboat was lost.

### B. Keelboats

An advance in design of boats occurred in the construction of keelboats.[3] Keelboats tended to be more stable and to draw more water than flatboats. Use of keelboats was apparently even more sporadic than that of flatboats. Evidence presented to the Court indicated that the only use of a keelboat on the Great Miami River occurred in 1821 and that use was unsuccessful. A keelboat company from Dayton to Fort Laramie was in existence in 1818 to 1820 but was unsuccessful in its endeavor. The use of keelboats on the Great Miami River and its tributaries was minimal and uniformly unsuccessful.

### C. Steamboats

The Court will take judicial notice that a steamboat was built and used on the Hudson River by Robert Fulton in 1809 and that the steamboat, Savannah, crossed the Atlantic in 1818. The first steamboat visited Cincinnati in 1811.[4] In contrast to the foregoing, no steamboat ever used the Great Miami River. Efforts by residents to clear and deepen the channel of the Great Miami River to allow steamboat use were a failure. The Miami Steamboat Company organized approximately in 1824, intended to improve the river and purchase a steamboat, was unable to raise sufficient money by sale of stock to do either (Plaintiff's Exhibit 2, at pp. 8 & 9).

### D. Tow Boats

The final method of utilizing rivers for upstream use which was potentially feasible during the period in question involved the use of boats towed upstream by horses or

---

3. A description of keelboats may be found in *U. S. v. Appalachian Power Co.*, 311 U.S. at 411, 61 S.Ct. at 301 (1940). "Keel boats were flat bottomed bateaux fifty to seventy feet long with a draft of two feet and a carrying capacity varying up to ten or twelve tons."

4. Wright, Alice, *Romance along the Ohio* (Marietta, Ohio: McDonald Printing Co. 1938), p. 24.

mules. They were used on the Erie Canal connecting Lake Erie to the Hudson River, and became the standard method whereby the Miami-Erie Canal functioned after 1829. No evidence was presented to the Court that at any time was a towpath constructed or even contemplated along the Great Miami River.

From the foregoing the Court finds that no method of commercial transportation during the period 1800 to 1830 was ever effectively utilized for upstream traffic along the Great Miami River or its tributaries. Only sporadic use during high water occurred for downstream use.

### 5. Overland Transportation

The alternative to water transportation during the period in question was overland transportation, using animals or wagons along the "roads" of the time. They were barely useable, although as previously noted, most of the original settlers of Dayton did travel from Cincinnati in this way. The testimony of defendants' expert witness Joan Fabe is a graphic description of such roads.[5] For much of the period, overland transportation between Cincinnati and Dayton was not a practical method of commercial transportation. Neither the river nor the roads offered the necessary connection between the two cities.

### 6. The Miami-Erie Canal

The necessity for safe, dependable and efficient transportation between the Dayton area and the Ohio River compelled the construction of a canal. All witnesses before the Court agreed that without the construction of the Miami-Erie Canal, the development of the area north of Cincinnati would not have occurred.

Effort to construct a canal began in 1822 when the General Assembly of Ohio directed that routes of canals from the Ohio River to Lake Erie be surveyed and a Canal Commission be established. Actual construction of the Miami-Erie Canal began in the area between Middletown and Cincinnati. By 1829 the canal had been constructed to Dayton, Ohio and it was subsequently opened in its complete length from Cincinnati to Lake Erie. The canal was forty feet wide and varied in depth from four feet at Cincinnati to six feet at Lake Erie. Both upstream and downstream traffic moved by the use of horses or mules towing the canal boats from a towpath along the side thereof.

**5.** "The first roads, be termed roads appear about 1810 in this area. Now their definition of a road was totally different than our definition of a road. The best of them we would think of—I guess you could compare them to a mountain trail that a backpacker would hike through in the Smokey Mountains today. There was no such thing as a road as we know of them. The best were trails with a pathway that you could see. Most of them were more apt to be something that was marked by the blazing of trees...

There was an Indian trail that followed the Great Miami path at this point. Again this was what they called a road....

Between 1810 and 1820 we began to get what they called wagon roads. This was the expressway of the period. Even the wagon roads did not resemble in any way, shape or form the most miserable road that we would see today. These were dirt roads. The trails widened barely enough for a wagon to get through; and I say barely because the branches and limbs of trees would be constantly hitting against the sides of the wagon or coach...

In addition to that, when these wagon roads were built they cut down the trees for the road, usually got the logs out of the way, but not all. But they never, ever cut the stumps down. And, of course, this is a very heavily forested area, so the road was full, completely full of stumps; you know, every few feet a stump, and the stumps would be anywhere from one foot to four feet high.

In addition to this, you had enormous potholes in which you would have to get oxen or horses to haul a wagon out. You couldn't pull it, drive it out by yourself. There were no bridges whatsoever, so that you would have to ford any streams or rivers. The road conditions were so bad that the average life of a wheel was considered to be four miles.

In addition to this, in the early days, again tapering off, but from the 1770's until, easily until 1815 I would say, land travel was extremely hazardous bcause—not only because of the Indians but because of robbers or what the people at the time called pirates constantly trying to waylay anybody on land. One of the cardinal rules for river transportation was 'Land as seldom as possible,' for the simple reason it was so hazardous that you would get killed and your goods taken away from you."

While the expert witnesses differed as to degree, all agreed that the canal had a profound effect upon the economics of the Great Miami River Valley. It survived the coming of the railroads some twenty years later and remained in use for almost ninety years. By 1920 it was outmoded as a form of commercial transport and in that year it was drained and the land returned to the State of Ohio for other uses.

No evidence was presented of any commercial traffic on the Great Miami River or on the tributaries which are before the Court after the construction of the Miami-Erie Canal.

## II.

### OPINION

The significance of the foregoing facts must be determined in light of decisions by the Supreme Court of the United States on the question of navigability. An early pronouncement on this issue may be found in *The Daniel Ball* case, 10 Wall 557, 19 L.Ed. 999 (1870). The Supreme Court of the United States held:

> those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used or are susceptible of being used *in their ordinary condition* as highways for commerce in which trade and travel are or may be conducted *in the customary modes of trade and travel on water....* (emphasis added)

*The Daniel Ball, supra* at 563.

The critical teaching of *The Daniel Ball* seems to be the "use test" under ordinary conditions.

At least two rivers have subsequently been considered under *The Daniel Ball* test. The DesPlaines River in Illinois was the subject of determination in *Economy Light & Power Co. v. United States,* 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847 (1920), and the New River in West Virginia was considered in *United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940). Defendant the United States urges that this Court determine the Great Miami River to be navigable largely by reliance upon the *Economy* and the *Appalachian Power* cases.

The Court deems *Economy* to be inapplicable in view of a factual determination set forth by the Supreme Court on page 117. That determination is:

> *Supplies in large quantity and variety needed by the early settlers also were transported over this route between Chicago and St. Louis and other points.* Canoes and other boats of various kinds were employed having light draft but capable of carrying several tons each and manned by crews of six or eight men. (emphasis added)

In contrast to the DesPlaines River the Great Miami River did not carry supplies in large quantity and variety. Its use at best was sporadic, seasonal and limited to downstream use.

The most recent pronouncement on navigability is found in the *Appalachian* case, *supra.* This case deals with the New River and examines in detail the significance of a phrase in *Daniel Bull* as to susceptibility of use. The Court stated:

> To appraise the evidence of navigability on the natural condition only of the waterway is erroneous. Its availability for navigation must also be considered. 'Natural and ordinary condition' refers to volume of water, the gradients and the regularity of the flow. A waterway otherwise suitable for navigation is not barred from that classification merely because artificial aides must make the highway suitable for use before commercial navigation may be undertaken... The District Court is quite right in saying that there are obvious limits to such improvements as affecting navigability. These limits are necessarily a matter of degree. *There must be a balance between cost and need at a time when the improvements would be useful.* (emphasis added)

*U. S. v. Appalachian Power Co., supra* at 407–408, 61 S.Ct. at 298–299.

The Court went on to point out that throughout the New River there was an abundance of water and that the flowage sufficed if other conditions made the New River available for navigation. *Appalachian, supra* at 410, 61 S.Ct. at 300.

The Supreme Court also pointed out that keelboats which were also known as "bateaux" were used for upriver traffic. The specific determination is:

> The evidence is clear that these bateaux plied from Hinton up to near Glen Lyn with fair regularity through the first decade of this century and well into the second. . . .

*Appalachian, supra* at 411, 61 S.Ct. at 301.

The reliance by the United States on the above cited cases appears to be misplaced except insofar as they determine a formula for considering the question of navigability. Unlike the situation in *Daniel Ball*, there was never a steamboat on the Great Miami River. Unlike the circumstances of *Economy Light & Power*, there were never "supplies in large quantity and variety needed by the early settlers" transported over the Great Miami River. Unlike *Appalachian Electric Power Company*, there was never the up and downstream use with "fair regularity".

Cases which seem to be more pertinent to the fact situation herein are as follows:

> While, therefore, it may not be easy for a court to define the size and character of a stream which would place it within the category of 'navigable waters of the United States,' or to define what traffic shall constitute 'commerce among the States,' so as to make such question sheer matters of law, yet, in construing the legislation involved in the case before us, we may be permitted to see that *it was not the intention of Congress to interfere* with or prevent the exercise by the State of Louisiana of its power to reclaim swamp and overflowed lands *by regulating and controlling the current of small streams not used habitually as arteries of interstate commerce.* (emphasis added).

*Leovy v. United States*, 177 U.S. 621 at 632, 20 S.Ct. 797 at 801 (1900).

While the evidence relating to the part of the river in the eastern half of the State is not so conclusive against navigability as that relating to the western section, we think it establishes that trade and travel neither do nor can move over that part of the river, in its natural and ordinary condition, according to the modes of trade and travel customary on water;—in other words, that it is neither used, nor susceptible of being used, in its natural and ordinary condition as a highway for commerce. *Its characteristics are such that its use for transportation has been and must be exceptional, and confined to the irregular and short periods of temporary high water. A greater capacity for practical and beneficial use in commerce is essential to establish navigability.*[1] (emphasis added)

[1] *United States v. Rio Grande Co.*, 174 U.S. 690, 698–699 [19 S.Ct. 770, 773–774]; *Leovy v. United States*, 177 U.S. 621 [20 S.Ct. 797, 44 L.Ed. 914]; *Toledo Liberal Shooting Co. v. Erie Shooting Club*, 90 Fed. 680, 682; *Harrison v. Fite*, 148 Fed. 781, 784; *North American Dredging Co. v. Mintzer*, 245 Fed. 297, 300.

*State of Oklahoma v. State of Texas*, 258 U.S. 574 at 591, 42 S.Ct. 406 at 413 (1922).

These conditions preclude the use of navigation of the area in question, in its natural and ordinary condition, according to the customary modes of trade or travel over water, and establish an absence of that capacity for general and common usefulness for purposes of trade and commerce which is essential to navigability. See *United States v. Rio Grande Irrigation Co., supra* [174 U.S.] 698 [19 S.Ct. 773]. *At most the evidence shows an occasional use of boats, sporadic and ineffective, as has been observed on lakes, streams or ponds large enough to float a boat, but which nevertheless were held to lack navigable capacity.* (emphasis added)

*United States v. Oregon*, 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267 (1935).

At a time when water transportation was so important that it represented not only the only practical method, but in fact the only possible method, use of the Great Mi-

ami River was limited to those years and to those seasons of the year when the river existed in a high water stage.

At a time when keelboats were designed for both upstream and downstream use they were never once used commercially in high or low water to proceed upstream.

At a time when steamboats became practical for upstream use, there was not one recorded instance of such a use on the Great Miami River.

At a time when the feasibility of constructing a towpath and using horses or mules to pull boats upstream had been demonstrated, there was not one recorded instance of such a use on the Great Miami River. These were the "customary modes of trade and travel on water". Their absence from the Great Miami River is significant.

Finally, at a time when the citizens of southwestern Ohio, desperate for adequate water transportation, were prepared to expend sizable sums of money to create it, they elected to spend not one penny upon improving the Great Miami River itself, but instead constructed an entirely new water way adjoining such river for much of its length. They abandoned forever any notion that the Great Miami River could be used for trade and commerce in any practical manner whatsoever.

If the critical need in the early Nineteenth Century for a dependable, year around, two-way artery of water commerce could be met only by the construction of a canal, then it must follow as a matter of logic that the Great Miami River did not meet this need.

Since no evidence was presented to the Court of any use of the river after 1830 and the opening of the Miami Erie Canal, the Court can only conclude that the river was not and is not used or susceptible of use in its ordinary condition as a highway for commerce over which trade and travel were or may be conducted in the customary mode of trade and travel by water.

III.

CONCLUSIONS OF LAW

A. This Court has jurisdiction to declare rights and legal relations in accordance with 28 U.S.C. § 2201.

B. The navigable waters of the United States are under the exclusive protection of the United States in accordance with 33 U.S.C. § 401 et seq.

■ C. A river is navigable in law when it is navigable in fact. Rivers are navigable in fact when they are used or are susceptible of being used in their ordinary condition for trade and travel in the customary modes of trade and travel. The Daniel Ball, 10 Wall 557, 19 L.Ed. 999 (1870).

■ D. A river is not navigable in fact when its use was sporadic, irregular and confined to downstream use during short periods of temporary high water. State of Oklahoma v. State of Texas, 258 U.S. 574, 42 S.Ct. 406, 66 L.Ed. 771 (1922).

E. The Great Miami River and its tributaries are not navigable in fact since they were never used except as set forth in Conclusion of Law D for the customary modes of travel and trade.

■ F. Where a canal is construed parallel to and adjoining a river and the canal is used exclusively at a time when water transportation was the customary mode of trade and travel, such river may be deemed non-navigable and incapable of improvement for navigation within an appropriate balance between cost and need. See United States v. Appalachian Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940).

■ G. In accordance with the foregoing the Court does declare that the Great Miami River, Loramie Creek, Stillwater River, Greenville Creek and Mad River are not now nor have they ever been navigable streams within the meaning of Section 10 of the Rivers and Harbors Act of 1899, 33 U.S. § 403.

IT IS SO ORDERED.