**UNITED STATES of America,
Plaintiff,**

v.

**R. R. LEWIS, Defendant.**

**No. 2895.**

United States District Court,
S. D. Georgia,
Savannah Division.

March 12, 1973.

R. Jackson B. Smith, Jr., U. S. Atty., Augusta, Ga., Lamar C. Walter, Asst. U. S. Atty., Savannah, Ga., for plaintiff.

Alphene W. Dowell, Savannah, Ga., for defendant.

## ORDER AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

LAWRENCE, Chief Judge.

### I. PROLOGUE

The history of American law during the last few years has been notable for growing public concern over protection of the environment and desire for improving it. Congress, state legislatures and the courts have reacted accordingly. People have become "aware of civilization's potential destruction from breathing its own polluted air and drinking its own infected water and the immeasurable loss from a silent-spring-like disturbance of nature's economy," says the Fifth Circuit in Zabel v. Tabb, 430 F.2d 199, 201, cert. denied, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808. That case involved the filling in of "eleven acres of tidelands in the beautiful Boca Ciega Bay in the St. Petersburg-Tampa, Florida area for use as a commercial mobile trailer park."

The present litigation involves the filling in of marshland for construction of a private causeway about one thousand feet long from high land on Wilmington Island to a navigable tidal creek. The controversy has evoked some of the emotionalism and rhetoric that environmental problems.often produce. At the trial Dr. Frederick C. Marland of the Georgia State Department of Resources, supporting his testimony to the effect that marshlands are "the nursery of the sea," was moved to quote Sidney Lanier's lines about the flooding tide in the marshes of Glynn as seen through the eyes of a poet-naturalist.

Zabel v. Tabb settles several of the issues in this case. Why, then, does this Court go to pains to remap so well-marked a path knowing fully where it comes out? The *Zabel* decision is not well known beyond legal and ecological circles. The legal issues involved in it are new to this State. The lay mind does not readily grasp the concept that marshes adjacent to a navigable stream are themselves deemed to be navigable and subject to federal regulatory jurisdiction. This is the first environmental law case to come before the United States District Court for the Southern District of Georgia in which marshland has been involved. That District embraces every acre of salt marsh in the State. It is estimated that Georgia's total tidal marsh area is nearly 500,000 acres of which 71,829 are in Chatham County. Much of it is privately owned

or claimed. The impact of recent federal law, as well as old, is therefore important and a better understanding desirable.

## II. THE LEWIS CAUSEWAY

In 1966 Raymond R. Lewis purchased a lot in a subdivision on Wilmington Island. It has a width of 100 feet and a length of approximately 500 feet on the highland side. Subsequently, he bought an adjoining 100-foot lot. The lots continue southward from the highland across the marsh to an unnamed tidal creek which forms their southern boundary. From the property looking to the south and west stretch a part of the vast sea-marshes of Georgia and the fantastic lacework of sounds, rivers and creeks that nature has woven along this coast.

One reason people buy property fronting on marshland is that a river or a creek is usually not far. Some of Mr. Lewis' neighbors built wooden docks over the marsh to the creek. Such meet the criteria of the Corps of Engineers. But thousand-foot docks are costly to erect and expensive to maintain. The defendant decided to construct a causeway to the creek. He was in the contracting business and had access to materials that could be used for land-fill.

In March, 1969, Mr. Lewis obtained a Chatham County building permit to construct a causeway.[1] Apparently he was told that he should talk to the Corps of Engineers which he did. He testified that he was informed that there was no federal jurisdiction unless the crossing of a navigable stream was involved and that he then proceeded with the project.

By June, 1970, the causeway, about 100 feet wide, extended some 700–800 feet or more across the marsh. Defendant's trucks and those of other persons dumped their cargoes into the marsh—earth, tree stumps, logs, branches, broken concrete, construction materials and other debris.

The first notice of the fill taken by the Corps of Engineers was apparently on June 23, 1970. A report as to "Unauthorized Activity in Navigable Water" on that date noted that "Roadway approx 800 feet completed—needs 100 feet more fill to reach the creek." A week later the District Engineer in writing requested the defendant to take immediate steps to prevent debris from entering the navigable waters of the United States and to stop construction until a Department of Army Approval of Plans has been issued. P. Ex. 22. Construction of the causeway seems to have stopped although there is a dispute as to that fact.

On March 2, 1971, the District Engineer informed defendant that he had had "ample opportunity to comply with the law" and that if he did not submit Plans within fifteen days the matter would be referred to the United States Attorney for action. P. Ex. 21.

## III. THE PLEADINGS

### COMPLAINT

This action is brought by the United States, through the Corps of Engineers, to permanently enjoin R. R. Lewis from filling in with refuse and debris certain marshland on Wilmington Island. Further relief is prayed in the form of an order compelling defendant to remove the materials that he placed or caused to be placed in the marsh. In the alternative, the Government asks compensatory damages in the amount of $43,000.

The complaint alleges that the fill is within the navigable waters of the United States since the affected marshland

---

1. In March, 1970, the Chatham County Commissioners amended the County's Subdivision Regulations in connection with the filling of marshland and the construction of bridges, causeways or walkways. The ordinance permits excavation and filling of marshland provided the use or structure assures the free flow of tidal water. The use of tree stumps and certain other materials as fill is prohibited. Approval by the Corps of Engineers is required when there is filling-excavation or encroachment of a navigable stream. Article VI, Sections 608.01 and 608.02.

is adjacent to a navigable creek which is tributary to Half Moon River. The filling operation is alleged to have commenced prior to July 28, 1970, and to have continued up to the time of the filing of the complaint in November, 1971.

Plaintiff alleges that the above described acts of defendant are violative of 33 U.S.C. § 403 and § 407.[2]

### ANSWER

The answer of defendant contains a number of defenses:

(a) The tributary creek is not a navigable water.

(b) The marshland adjacent is the private property of defendant originating in a royal grant and the United States has no jurisdiction over it.

(c) The estuarine marshland is not a navigable water.

(d) By its environmental legislation the Government is attempting to require defendant to use his property as a sanctuary for wildlife and marine life which constitutes the taking of property without due process of law.

(e) Before beginning the fill project defendant talked to an official of the Corps of Engineers and was informed that it had no jurisdiction if the causeway was not going to cross a navigable stream or if nothing was to be thrown in such waters.

(f) The action by the Government constitutes invidious discrimination against the defendant in that numerous similar causeways have been constructed in Chatham County without the United States taking action against the individuals and corporations that have done so.

(g) The Government cannot be heard to complain because of its knowledge of defendant's intentions and its permitting him to complete the causeway at large expense.

---

2. These sections are part of the Rivers and Harbors Act of 1899. Section 403 prohibits, among other things, the creation of any obstruction to the navigable capacity of any of the waters of the

## IV. SOURCES OF FEDERAL REGULATORY AUTHORITY OVER NAVIGABLE WATERS AND MARSHLANDS

(1) *The Commerce Clause and Federal Power Over Our Tidal Areas.*

The power of the United States over its waters capable of use as interstate highways stems from the authority to regulate commerce among the several states delegated to Congress under Art. I, Sec. 8, par. 3. In determining the navigability of a stream, the true criterion is capability rather than the manner and extent of the use. The Montello, 20 Wall. 430, 87 U.S. 430, 22 L.Ed. 391. Lack of commercial traffic is no bar to a conclusion of navigability where personal or private use by boats demonstrates the availability of the stream for the simpler types of commercial navigation. United States v. Appalachian Electric Power Co., 311 U.S. 377, 416, 61 S.Ct. 291, 85 L.Ed. 243. See also United States v. Crow, Pope & Land Enterprises, Inc., 340 F.Supp. 25, 31–33 (N.D., Ga.), dismissed on appeal, 474 F. 2d 200 (5th Cir.); United States v. Underwood, 344 F.Supp. 486, 490 (M.D., Fla.).

The power to regulate extends to the entire bed of the stream and includes lands below the ordinary high water mark. United States v. Chicago, Milwaukee, St. Paul and Pacific Railroad Company, 312 U.S. 592, 597, 313 U.S. 543, 61 S.Ct. 772, 85 L.Ed. 1064. Jurisdiction embraces the whole surface of bodies of water subject to tidal action no matter how shallow or obstructed. A common sense view "permits no distinction upon the ground of navigability between the shallows and depths of navigable waters. . . ." United States v. Turner, 175 F.2d 644, 647 (5th Cir.), cert. denied, 338 U.S. 851, 70 S.Ct. 92, 94 L.Ed. 521.

---

United States. Section 407 makes it unlawful to throw or deposit refuse matter of any description into any navigable water of the United States.

██ In defining "navigable waters" for regulatory purposes the Corps of Engineers has stated that its jurisdiction extends "laterally to the entire water surface and bed of a navigable water body" and has declared that it "includes all the land and waters below the original high water mark." Jurisdiction in coastal areas extends to the line on the shore reached by the plane of the mean (average) high water. Where precise determination of that line is necessary it should be established by survey based on tidal averages over a period of 18.6 years.[3] Marshlands are "navigable in law" only so far as the area is "subject to inundation by the mean high waters." See 37 Federal Register, No. 176, Part 209.260.

██ Navigability for federal regulatory purposes is governed by federal law and state law is not authoritative in such cases.[4] See Wisconsin v. Federal Power Commission, 214 F.2d 334, 336–337 (7th Cir.), cert. denied, 348 U.S. 883, 75 S.Ct. 124, 99 L.Ed. 694; Brewer-Elliott Oil & Gas Co. v. United States, 260 U.S. 77, 87, 43 S.Ct. 60, 67 L.Ed. 140.

(2) *The Rivers and Harbors Act of 1899*

Section 10 of this legislation provides that "any obstruction" to the navigable capacity of any of the waters of the United States is prohibited except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army. That Section makes it unlawful to excavate or fill, without such sanction, so as to alter or modify the course, location or condition of the "channel of any navigable water of the United States." 33 U.S.C. § 403. As earlier noted, Section 407 makes it unlawful to deposit refuse in navigable waters or any tributary thereof.

For many years it was supposed that Section 403 empowered the Secretary of War to grant or deny permits only for navigational reasons. See, for example, opinion of the United States Attorney General, January 25, 1923, 30 U.S.Atty. Gen.Ops. 410 at 412, 415, 416; Miami Beach Jockey Club v. Dern, 66 App.D.C. 254, 86 F.2d 135, 136. The legislative history of the Rivers and Harbors Act of 1899 lends little support to the theory that the Congress conceived it was dealing with anything more than obstructions, structures or fill affecting navigability.[5] Until the mid-1960's "public notices announcing the filing of applications for permits to fill, dredge or construct works in navigable waters, defined the Corps' interest as being confined to issues of navigation, and requested comments from the public only on such issues." [6]

3. That period represents the "node cycle" which is thus described in "Tide and Current Glossary" (U. S. Department of Commerce, Coast and Geodetic Survey, 1949 ed.): "Period of approximately 18.6 Julian years required for the regression of the moon's nodes to complete a circuit of 360° of longitude. It is accompanied by a corresponding cycle of changing inclination of the moon's orbit relative to the plane of the earth's equator with resulting inequalities in the rise and fall of the tide and velocity of the tidal current."

4. Under Georgia law a navigable stream "is one capable of bearing upon its bosom, either for the whole or a part of the year, boats loaded with freight in regular course of trade. The mere rafting of timber or transporting of wood in small boats shall not make a stream navigable." Ga.Code § 85–1303. "A navigable tidewater is any tidewater . . . where the tide regularly ebbs and flows, which is in fact used for the purposes of navigation, or is capable of bearing upon its bosom, at mean low tide, boats loaded with freight in the regular course of trade." Ga.Code § 85–1308.

5. For the legislative history see 2 Environmental Law Reporter, 10022f.; Ray M. Druly, "The Refuse Act of 1899" (Monograph No. 11), pp. 3–4, Environment Reporter, 1972.

6. Report No. 91–917 of House Committee on Government Operations, 91st Congress, 2nd Session (1970), p. 2. The Report adds that this "restricted view of the 1899 act, however, was not required by the law." In support of this statement United States ex rel. Greathouse v. Dern, 289 U.S. 352, 53 S.Ct. 614, 77 L.Ed. 1250 was

In 1967 the Corps amended its Regulations to provide that "the decision as to whether a permit will be issued must rest on an evaluation of all relevant factors, including the effect of the proposed work on . . . fish and wildlife, conservation . . . ecology, and the general public interest. . . ." 33 CFR § 209.120(f). Any application by Lewis to fill had to be evaluated on these as well as navigational considerations.

### (3) *Submerged Lands Act of 1953*

Under this legislation Congress relinquished federal title to lands and natural resources (including marine animal and plant life) beneath navigable waters within the boundaries of the states. The United States specifically reserved "all of its . . . rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation. . . ."

The Act in question grew out of the controversy over off-shore oil and gas and the rights of the states to the benefits and control of the exploration and development of such resources. In Zabel v. Tabb the Court held (430 F.2d p. 206) that the Submerged Lands Act did not surrender the federal government's authority to regulate the use of tidal wetlands for conservation purposes.

### (4) *The Federal Fish and Wildlife Coordination Act of 1958*

This legislation provides that where the waters of any stream are impounded, diverted or otherwise controlled or modified for any purpose whatever, the United States Fish and Wildlife Service and the head of the wildlife agency of the state concerned shall be consulted with a view to conservation of such resources. 16 U.S.C. § 662(a). The Senate Report on the Coordination Act of 1958 refers to the "profoundly disturbing effect" upon aquatic life of dredging, diking and filling. The placing of fish and wildlife on a parity with flood control, irrigation, navigation and other water resource programs would achieve, reported the Committee, an objective long sought by conservationists. See 1958 U.S.Code Cong. & Admin.News, pp. 3446, 3448, 3450.

### (5) *The national Environmental Policy Act of 1969*

This Act recognizes the responsibility of the federal government to improve and coordinate federal plans, functions and resources to the end that the nation may "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations." 42 U.S.C. §§ 4331–4347. All agencies of the government must include an Environmental Impact Statement in every recommendation or report on major federal actions that may significantly affect the quality of the human environment. Under the Act the President is required to transmit to Congress annually an "Environmental Quality Report" which shall include, among other things, the status and condition of the "aquatic, including marine, estuarine . . . environment." § 4341.

## V. ZABEL V. TABB AGAIN

In *Zabel* the Fifth Circuit pointed out (430 F.2d p. 213) that under the Environmental Act the Army "must consult with, consider and receive, and then evaluate the recommendations of all of these other agencies articulately on all these environmental factors." The

---

cited. In recent years federal courts have liberally construed the term "obstruction" in § 403. See United States v. Republic Steel Corporation, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903, and United States v. Perma Paving Company, 332 F.2d 754 (2nd Cir.). This is also true of § 407, commonly called the "Refuse Act of 1899." In fact, in 1969 it was held that there

was a violation by a shorefront property owner depositing loose timber on the bank of a river (50 to 100 feet from the high water mark) which was liable to be washed into the stream by high tides and storms. United States v. Federate Homes, Inc., (S.D., N.Y.). See the synopsis of this unreported case in Environmental Law Review, 1971, 545.

Court observed (p. 204) that "the destruction of fish and wildlife in our estuarine waters does have a substantial, and in some areas, a devastating effect on interstate commerce." The central issue in *Zabel* was thus phrased by the Court:

"(1) Does Congress for ecological reasons have the power to prohibit a project on private riparian submerged land in navigable waters? (2) If it does, has Congress committed the power to prohibit to the Secretary of the Army?"

The Court answered, "When the House Report [7] and the National Environmental Policy Act of 1969 are considered together with the Fish and Wildlife Coordination Act and its interpretations, there is no doubt that the Secretary can refuse on conservation grounds to grant a permit under the Rivers and Harbors Act."[8]

## VI. EVIDENCE AS TO NAVIGABILITY; INUNDATION OF MARSH AT HIGH WATER; ECOLOGICAL IMPACT OF CAUSEWAY

On November 29, 1971, a preliminary injunction was entered by consent. The hearing on the application for permanent injunction took place on December 1st and 4th, 1972. I have previously dealt with portions of the evidence and now take up the above-mentioned aspects of the case.

(1) *Navigability of Unnamed Creek.* The existence of a fixed and a floating dock at the end of the causeway at the creek is in itself evidence that the stream is navigable. It has a depth in the immediate area of 2.5 to 3.5 feet at low tide and between 9.5 and 10.5 feet at mean high tide. During inspections by the Corps of Engineers access was obtained by a 17.9-foot launch having an 18-inch draft.

The unnamed creek branches off from Half Moon River and a little further forks into two branches. The western prong passes the Lewis property and dead-ends not far beyond in the form of vermicular tidal streamlets. Half Moon River to which the unnamed creek is a tributary is used by commercial fishing vessels. In 1932 the Corps of Engineers classed Half Moon as "Unquestionably Navigable" for its whole length, 4.3 miles. P. Ex. 15. Once a waterway is found to be navigable it "remains so." United States v. Appalachian Electric Power Co., *supra*, 311 U.S. at 408, 61 S.Ct. 291, 85 L.Ed. 243.

Half Moon River flows into Wassaw Sound which, in turn, forms an estuary of the Atlantic Ocean. It also connects, via Tybee Cut, with the broad and deep Wilmington River. Further up, the latter stream forms a ten-mile stretch of the Intercoastal Waterway, an important artery of marine traffic and commerce.

(2) *Inundation of Marshland at Mean High Tide.* The tidal records over an 18½ year cycle period reflect that the mean high tide elevation in the vicinity involved is 7.1 feet. There was testimony from a Government witness that at that level a solid sheet of water covers the marshland area from the unnamed creek to high land. A photograph taken at high water on December 9, 1971, bears this out. P. Ex. 20. A profile and cross-section plat demon-

---

7. The House Report (see footnote 6) was based on a study by a subcommittee of the Committee on Government Operations entitled: "Our Waters and Wetlands: How the Corps of Engineers Can Help Prevent Their Destruction and Pollution." The Committee Report states that in considering landfill applications in navigable waters the Corps should give increased consideration to the effects of the proposed work on conservation of natural resources, fish, wildlife and ecology.

8. *Zabel* has been characterized as "a landmark decision because it is the first formulation of principle which sanctions strict agency vigilance over natural resources." Case Note by William A. Goldstein in Environmental Law Review, 1972, 594. For other cases in this area of law see: United States v. Moretti, 331 F.Supp. 151 (S.D., Fla.); United States v. Baker, 2 ERC 1849 (S.D., N.Y.); United States v. Underwood, *supra*, 344 F.Supp. 493.

strates that at a 7.1 foot tide the entire marsh area involved will be completely covered. P. Ex. 17. As shown by the exhibit just referred to as well as an aerial photograph, the marsh area contains a network of small tidal streams. They have water in them at half tide or lower. The flow through these little channels is obstructed by the fill. The causeway also prevents the free ebb and flow of the tide across the affected area. In the words of the witness, Dr. Marland, it acts as "a dam to the flow of tides."

 The evidence satisfies the applicable federal jurisdictional criteria that the marshland be "below the original high water mark" and "subject to inundation by the mean high waters."[9]

(3) *Ecological and Environmental Factors.* Joseph Carroll who is a Marine Biologist with the Fish and Wildlife Service of the Department of Interior testified as to the importance of the productivity of marsh areas to organisms in the off-shore waters. Marshlands are a primary energy source and provide a basic unit in the food chain of sea animal life.[10] The unrestricted ebb and flow of the tide has a cleansing effect on plant and animal life in marshland areas. There was evidence that the causeway caused a fair-sized area of spartina to die because it became matted down by other wind-driven marsh grass and lacked the tidal flow of salt water to be regenerated.

A marine biologist testified that the entire fill should be removed in order to permit natural restoration of the area. Both he and another witness were of the opinion that any application for a fill would be rejected by federal and state authorities, there being an alternative method to the one used, namely, a dock on pilings.

## VII. OTHER DEFENSES RAISED BY DEFENDANT

 (1) *Contention that Private Property is Taken Without Payment of Just Compensation.* Claiming title to the marsh running back to a royal grant, defendant denies that federal jurisdic-

9. In 1970 the General Assembly of Georgia enacted the Coastal Marshlands Protective Agency Act. Under the legislation no person shall "remove, fill, dredge or drain or otherwise alter any marshlands in this State within the estuarine area thereof without first obtaining a permit from the Coastal Marshlands Protective Agency." Code of Georgia Ann. § 45–136 et seq. That area is defined as areas upon which grow either one or all of the following: "saltmarsh grass (Spartina alterniflora), black grass (Juncus gerardi), high-tide bush (Iva frutescens var. oraria)." The "estuarine area" embraces "all tidally-influenced waters, marshes and marshlands, lying within a tide-elevation range from five and six-tenths feet above mean tide level and below. At the hearing before this Court it was explained by a witness that when "mean tide level" is used as a basis of reference, the elevations compared with the mean low water plane would have a difference of 3.5 feet. Therefore, 5.6 feet above mean tide level would equal 9.1 feet above the mean low water level. Under this statute State jurisdiction attaches in the case of marshlands at a tide level approximately two feet higher in elevation than that which confers federal regulatory jurisdiction over marshlands adjacent to navigable water.

10. "A Georgia salt marsh can outperform an average wheatfield several fold in organic production." The same author says that at least two-thirds of the nation's commercial fishing resources are made up of species that "spend part of their life cycle in estaurine areas." Ludwik V. Tetclaff, "The Coastal Zone —Control Over Encroachments in the Tidewaters," Environmental Law Review (1972), 618, 619. Georgia's Spartina alterniflora marshes produce five to nine tons of plant material an acre a year." "Can We Save our Salt Marshes," National Geographic, Vol. 141 (June, 1972), p. 733. Another writer says that an acre of Georgia marshland produces annually 4.8 tons of marsh grass and marsh plants with high nutrient content. The marshes produce the phosphate, sugar and other nutrients which sustain the mud algae and plankton that in turn nurture a wide variety of estaurine life, including fish, oysters, shrimp and clams. See William A. Niering, The Life of the Marsh (McGraw-Hill, 1966), 168–169.

tion over his private property exists and maintains that the regulation of his rights of ownership constitutes denial of due process and the taking of property without just compensation. This opinion in no manner deals with defendant's or anyone else's title to marshland. The Government does not contest it in this case. "The flow of a navigable stream is in no sense private property" (United States v. Appalachian Electric Power Co., *supra*, 424, 61 S.Ct. 307) and the exercise of federal regulatory authority over lands below ordinary high water mark is not an invasion of compensable property rights. There is "no taking" in such a case. See United States v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co., *supra*, 312 U.S. 594, 61 S. Ct. 772, 85 L.Ed. 1064; United States v. Commodore Park, Inc., 324 U.S. 386, 390, 65 S.Ct. 803, 89 L.Ed. 1017; United States v. Chandler-Dunbar Water Power Company, 229 U.S. 53, 62, 33 S.Ct. 667, 57 L.Ed. 1063; Zabel v. Tabb, 430 F.2d 215.

 (2) *Estoppel.* While not articulated in terms of equitable estoppel, defendant contends that the Corps having allowed him to start the project and then standing by and watching him complete the causeway cannot now be heard to complain. As previously pointed out, it appears that someone in the Corps of Engineers may have misconceived its jurisdiction in the first instance and erroneously informed Mr. Lewis that it had none if no obstruction of a navigable stream was involved. Equitable estoppel or laches do not generally estop a governmental unit when functioning in a governmental capacity. 28 Am.Jur.2d Estoppel and Waiver §

123; Beaver v. United States, 350 F.2d 4 (9th Cir.), cert. denied, 383 U.S. 937, 86 S.Ct. 1067, 15 L.Ed.2d 854. As soon as the Corps of Engineers officially became aware of the fill, the defendant was notified to cease work until a plan was submitted and approved.

Approval of the construction of the causeway through equitable estoppel cannot be spelled out of the record in this case.

(3) *Discriminatory Enforcement by Corps of Engineers.* Defendant's answer asserts that plaintiff has invidiously discriminated against him in that the Army has not taken steps against other property owners who have built similar causeways on marshland.

 Selective enforcement of a statute where discrimination is invidious and purposeful offends Equal Protection. Zayre of Georgia, Inc. v. City of Marietta, 416 F.2d 251 (5th Cir.); Whitney Stores, Inc. v. Summerford, 280 F.Supp. 406, 411 (D.C.S.C.). In any event, this rule does not ordinarily apply to the enforcement of statutes by administrative agencies. 2 Am.Jur.2d Administrative Law § 194. The evidence in this case fails to support any contention of discriminatory enforcement.[11]

## VIII. INJUNCTIVE AND OTHER RELIEF; COMPENSATORY DAMAGES

 The construction of the causeway without a permit from the Army violates the "obstruction" section of the Rivers and Harbors Act and the unauthorized deposit from the shore of refuse matter into navigable water (the marsh) or tributary of navigable water from which the same may be washed

---

11. Perhaps counsel would be on more arguable ground in comparing defendant's causeway (about two acres) and its minor ecological disturbance to the massive disturbance to marine life involved in the construction of causeways over salt marshes along Interstate 95 and those across Skidaway Narrows. However, after all, highways on the coast are *pro bona publico.* Unfortunately for the finny

tribe and the crustaceans destroyed in such dredging and filling they did not have a spokesman like the late Robert Benchley who, required as a student in International Law to write a term paper on the treaty between the United States and Great Britain in respect to the North Atlantic Sea Fisheries, wrote his thesis from the point of view of the fish.

into navigable water is a violation of 33 U.S.C. § 407. There was testimony that a storm washed away 4,000 of the 16,000 cubic yards of debris and earth comprising the fill.

Following the trial, plaintiff filed an affidavit in which a Civil Engineer for the Corps estimated that if the work is done by an independent contractor the cost to the Government of removing the causeway (and dock) will amount to $43,000 on the basis of $2.25 cubic yard of fill. The affidavit of another Civil Engineer, a specialist in estimating project costs, states that if the removal of the fill is performed by the owner, it can be accomplished for approximately $9,500.

Under fact and law, a permanent injunction against further work on the causeway must be granted. The more difficult problem is the mandatory phase of injunctive relief. In cases such as this, relief may include grant of an "injunction for removal of obstructions and restoration of the area surrounding a navigable water to its original condition." United States v. Underwood, *supra*, 344 F.Supp. 494; United States v. Moretti, *supra*, 331 F.Supp. 159; United States v. Baker, *supra*. The inherent power of this Court includes enjoining the sale of land on which the fill is located until removal thereof. United States v. Moretti, at 159. Where the party causing the injury to navigable waters refuses to remedy the situation and the government is compelled to do so, it is entitled to the equivalent cost in damages. United States v. Perma Paving Co., *supra*, 332 F.2d 758; United States v. Underwood, 344 F.Supp. at 494.

The Red Queen's approach to things ("if something wasn't done about it in less than no time, she'd have everybody executed, all around") is understandable in Alice's *Wonderland* but in this Court a less decollated method of meting out justice is desirable. In a case where legal concepts such as estoppel and laches are not supported in fact, the underlying circumstances may still be relevant in determining the character of equitable and other relief. At the hearing the possibility of large culverts or openings in the causeway was mentioned. The Government would have no part of it. The boot is not all on one foot.

I have referred to Mr. Lewis's contention concerning an interview with an official of the Corps in 1969. He was Steven Osvald who administers the policy of protection of navigable waters. Mr. Osvald testified that pamphlets and instructions were given Mr. Lewis and that he informed him that the proposed use of car bodies for a fill project was not acceptable. He also stated that Lewis told him that the land to be filled was high ground. Osvald testified that he informed defendant that additional information was needed in order to determine whether a permit was required and that one would be necessary if the work was to be performed in "navigable waters."

In the face of this information or in the light of it (as one prefers) Mr. Lewis proceeded with his marsh-fill. To him "navigable water" probably meant an entirely different thing than it did to Mr. Osvald. Nevertheless, everyone is presumed to know the law (29 Am.Jur. Evidence § 222) for, were the rule otherwise, as John Selden once said, "tis an excuse every man will plead, and no man can tell how to refute him." Judge-made as well as statutory law is included in the presumption (Green, The Georgia Law of Evidence § 46) and it also extends to duly promulgated and published regulations of administrative bodies. See United States v. International Minerals & Chemical Corp., 402 U.S. 558, 563, 91 S.Ct. 1697, 29 L.Ed.2d 178.

The Corps of Engineers cannot inspect every foot of tidal marshland in its jurisdiction to make sure that nobody is violating the law. By the time a neighbor complained in June, 1970, the fill was nearly completed. Injunctive relief against the construction of the causeway could have been had for the

asking for a year or more.[12] But it was not sought and this Court is now confronted with the problem of what to do about a *fait accomplis*.

If the fill is to be removed, the manner, extent and time thereof must be prescribed in the final decree. An incidental matter to be considered is where the material is to be deposited when removed. Not much will have been achieved if taking the refuse and debris from the marsh merely creates an eyesore somewhere else.[13] Another question is the burning of stumps at the fill site. The time element must also be considered. Finally, there is the question of who will perform the work and, if the Corps has to do so, what compensatory damages are awardable?

There are possibly other matters to be considered in drafting a final decree. As the record now exists it does not permit a satisfactory resolution of the problem of mandatory relief. A hearing as to the character, extent and form of injunctive and other relief will be held in the near future.

---

12. The Army thereafter withheld bringing an action for seventeen months although according to the Government's testimony any application as to the fill would have been rejected.

13. If earth is removed from the fill it might be utilized in building up the low land bordering the marsh. In the storm on December 3, 1971, the water came up into the yard of the Lewis residence.