SIERRA CLUB et al., Plaintiffs,

v.

LESLIE SALT COMPANY et al., Defendants.

LESLIE SALT COMPANY, Plaintiff,

v.

Robert F. FROEHLKE, Secretary of the Army, et al., Defendants.

Nos. 72–561 WTS, 73–2294 WTS.

United States District Court, N. D. California.

March 11, 1976.

John D. Hoffman and Michael R. Sherwood, Sierra Club Legal Defense Fund, Inc., San Francisco, Cal., for Sierra Club.

Edgar B. Washburn and Frederick M. Wooster, Jr., firm of Landels, Ripley & Diamond, San Francisco, Cal., for Leslie Salt Co.

David E. Golay, Asst. U. S. Atty., San Francisco, Cal. and William L. Want, Dept. of Justice, Washington, D. C., for Froehlke.

## MEMORANDUM OF DECISION

SWEIGERT, District Judge.

These two consolidated actions are brought for injunctive and declaratory relief under the Rivers and Harbors Act of 1899 (33 U.S.C. § 401 et seq.) and the Federal Water Pollution Control Act of 1972 (33 U.S.C. § 1251 et seq.).

In No. 72–561, plaintiffs Sierra Club and Save San Francisco Bay Association, conservation organizations, and plaintiff Kent Dedrick, an individual member of the Sierra Club, sue defendants, Leslie Salt Co., Leslie Properties, Inc., and defendant Mobil Oil Estates. These defendants own many thousand acres of property along the shores of San Francisco Bay including diked evaporation ponds used for the production of salt. The plaintiffs seek a declaratory judgment that the dikes in and around the portion of defendants' (hereinafter "Leslie's") property known as Bair Island were illegally built and a permanent injunction ordering their removal or in the alternative prohibiting further construction or maintenance of dikes at Bair Island.

In No. 73–2294 the plaintiff is Leslie Salt Co., suing defendants the Secretary of the Army, the Chief of the United States Army Corps of Engineers, and the District Engineer of the Corps, San Francisco District, South Pacific Region (hereinafter "the Corps"), and Sierra Club (an intervenor) seeking a declaratory judgment that the Corps' assertion of jurisdiction shoreward beyond the mean high water (hereinafter "MHW") line is unlawful in that plaintiff's property above the MHW line does not constitute "navigable waters of the United States," also a permanent injunction restraining the Corps from requiring permit applications pursuant to the Rivers and Harbors Act of 1899 (33 U.S.C. § 401 et seq.) or the Federal Water Pollution Control Act of 1972 (hereinafter "FWPCA") (33 U.S.C. § 1251 et seq.) for any work to be performed above the MHW line.

## THE PENDING MOTIONS

The action is now before the court on Leslie's motions for summary judgment in both 72–561 and 73–2294 and on defendants' (Corps and Sierra Club) motion to dismiss or for summary judgment in 73–2294.

## ISSUES PRESENTED

Three issues presented by these motions are: (1) Whether the terms "navigable waters," "navigable water of the United States" and "waters of the United States," as used in defining the geographical extent of the Corps' regulatory jurisdiction under the Rivers and Harbors Act of 1899 (33 U.S.C. § 401 et seq.) and the Federal Water Pollution Control Act of 1972 (FWPCA) (33 U.S.C. § 1251 et seq., especially § 1344), are limited to the line of mean high water (MHW) or extend to the line of mean higher high water (MHHW) on the Pacific Coast—including San Francisco Bay; (2) whether the properties here in question, i. e., Bair Island as well as Leslie's other salt evaporation and other San Francisco Bay properties over which the Corps asserts jurisdiction, are within the Corps' jurisdiction as defined in the two Acts; (3) if the Corps has jurisdiction over these properties, whether or to what extent the Corps is estopped from asserting such jurisdiction.

## MEAN HIGH WATER AND MEAN HIGHER HIGH WATER

In order to understand the record below summarized, the contentions of the parties and the issues in this case, it is necessary to explain at the very outset the meaning of the two terms *"mean high water"* (MHW) and *"mean higher high water"* (MHHW): Each day (more precisely, within every 24.8 hours) both coasts of the United States experience two high tides, one of which rises to a relatively higher shoreward level than the other. The mean high water (MHW) line is the average of both high tides over a period of 18.6 years; the mean higher high water (MHHW) line is the

average of only the higher of the two tides for the same period of time. (*Tide and Current Glossary*, U.S. Department of Commerce, U.S. Coast and Geodetic Survey, Special Pub. No. 228 (1949)). The record shows that on the Atlantic Coast the difference between MHW and MHHW is slight, and that on the Pacific Coast the difference is substantial.

## THE EVIDENTIARY RECORD

The evidentiary record as to action 73–2294[1] shows in substance and without dispute that plaintiff Leslie owns approximately 35,000 acres of property along the shore of San Francisco Bay; that all of this property was originally marshland; that the property has been diked and reclaimed for agricultural and other purposes and has been used primarily for salt production by means of evaporation of Bay waters within the dikes; that the property was reclaimed and the dikes were built during the period 1860 to 1969, most of the work having been completed by 1927; that most or all of this property lies landward of the MHW line and bayward of the former mean higher high water (MHHW) line of the Bay in its natural state; that most or all of the property in its natural state was subject to the ebb and flow of the tide but that it has not been subject to tidal action since being reclaimed; that from 1899, the year of the adoption of the Rivers and Harbors Act, to 1971 the Corps failed to exercise jurisdiction over this property; that in 1971 and 1972 the Corps published two Public Notices (No. 71–22—June 11, 1971, and No. 71–22(a) —January 18, 1972) stating, in effect, that the Corps had changed its policy and would require permits for all "new work" on the property in question; that

pursuant to this new policy the Corps has issued a number of cease and desist orders to Leslie and has threatened criminal penalties and fines of $2500 per day.

The evidentiary record as to action 72–561[2] shows in substance and without dispute that the property in question in that action is an area of approximately 3,000 acres along the shore of San Francisco Bay in San Mateo County, California, known as Bair Island which is physically similar to Leslie's land described above with reference to 73–2294 although Bair Island is no longer used for salt production; that the dikes on Bair Island were constructed between 1900 and 1952; that, as with Leslie's 35,000 acres above described, the Corps failed to exercise jurisdiction over the property until 1971.

## I. GEOGRAPHICAL EXTENT OF FEDERAL REGULATORY JURISDICTION UNDER THE ACTS

Leslie contends in substance that the Corps of Engineers' jurisdiction under these two Acts extends only to the mean high water (MHW) line, relying on numerous cases holding that the Corps' jurisdiction over coastal navigable waters extends only to the MHW line.

The Corps and the Sierra Club contend that the Corps' jurisdiction on the Pacific Coast extends to the mean higher high water (MHHW) line, relying on what they contend is the underlying principle of various Atlantic coast and inland river cases.

This court has already ruled in its Memorandum of Decision of December 9, 1974, in No. 73–2294, 403 F.Supp. 1292, that on the Pacific Coast "navigable waters,"

---

1. The record in 73–2294 includes affidavits of Washburn, Thinggard, Collet and O'Halloran on behalf of plaintiffs; also answers to interrogatories and admissions by plaintiffs and defendants, depositions with exhibits of Blalock, Collet, Camm, Nichols, Ahlgren with corrections, Wilkins, Hodwin and Roberts, and exhibits attached to briefs.

2. The record in 72–561 includes affidavits of Hoffman, Lopez and Collet on behalf of plain-

tiff, affidavits of Thinggaard, Wilkins and Washburn on behalf of defendants, also depositions with exhibits of Dalve, Lopez, Beeger, Torres, Thurlow, Hull, Collet, Camm, Nichols, Wilkins, Godwin, Robers, Sparks, and Gill, answers to interrogatories and admissions by plaintiffs and defendants, and exhibits to briefs and to defendants' statements of facts.

within the meaning of the *FWPCA*, extends up to the mean higher high water (MHHW) line. However, we did not decide the extent of the Corps' jurisdiction under the Rivers and Harbors Act.

■ The FWPCA and the Rivers and Harbors Act must be distinguished. As set forth more fully in our Memorandum of Decision of December 9, 1974, 403 F.Supp. 1292, at p. 1295, the FWPCA, first enacted in 1948 and amended in 1972, makes unlawful the "discharge of a pollutant," including such materials as dredged rock or sand, into "navigable waters." (33 U.S.C. § 1311(a)). The 1972 amendments, however, (33 U.S.C. § 1344) provide, as an exception to the general prohibition against discharges, that the Corps is empowered to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." We ruled, in our earlier decision, that "navigable waters" within the meaning of the FWPCA extended up to the MHHW on the Pacific Coast. Coast.

The Rivers and Harbors Act, enacted in 1899, makes unlawful certain specified activities, including filling or the erection of a dike or obstruction in "navigable water of the United States" or in "waters of the United States" without, however, defining those terms.

Since the pending actions involve jurisdiction to regulate filling, dikes, and other obstructions, as well as jurisdiction to regulate the discharge of dredged or fill material, the powers of the Corps would stem from the Rivers and Harbors Act as well as from the FWPCA. It therefore becomes necessary to consider the extent of the Corps' jurisdiction under the Rivers and Harbors Act.

Although no definition of "navigable waters" or "waters of the United States" is included in the Rivers and Harbors Act itself, regulations defining these terms (as used in both the Rivers and Harbors Act and the FWPCA) have been adopted by the Corps. The Corps' "Interim Final Regulation" (33 CFR 209.-120(a), (b)(1), (b)(2), (b)(7) and (d)(1), in effect since July 25, 1975, revising the earlier version of § 209.120) defines "navigable waters" as used in the Rivers and Harbors Act as follows:

"Waters that have been used in the past, are now used, or are susceptible to use as a means to transport interstate commerce landward to their ordinary high water mark . . . and also waters that are subject to the ebb and flow of the tide shoreward to their mean high water mark (*mean higher high water mark on the Pacific Coast.*) See 33 CFR 209.260 (ER 1165–2–302) for a more definitive explanation of this term." (emphasis added)

Regulation 209.260, adopted September 9, 1972, contains a lengthy general definition of navigable waters (subsect. (c) through (j)) and then in subsect. (k) and (*l*) defines "geographical and jurisdictional limits of oceanic and tidal waters" as follows:

"(k)(1)(ii) *Shoreward limit of jurisdiction.* Regulatory jurisdiction in coastal areas extends to the line on the shore reached by the plane of the mean (average) high water. *However, on the Pacific coasts, the line reached by the mean of the higher high waters is used.* (emphasis added)

"(2) *Bays and Estuaries.* Regulatory jurisdiction extends to the entire surface and bed of all water bodies subject to tidal action. Jurisdiction thus extends to the edge (as determined by paragraph (k)(1)(ii) of this section, 'Shoreward Limit') of all such water bodies, even though portions of the water body may be extremely shallow, or obstructed by shoals, vegetation, or other barriers. Marshlands and similar areas are thus considered 'navigable in law,' but only so far as the area is subject to inundation by the mean high waters. The relevant test is therefore the presence of the mean high tidal waters, and not the general test described above, which generally applies to inland rivers and lakes.

"(1) *Geographic Limits: Shifting Boundaries* . . . [A]n area will remain 'navigable in law,' even though no longer covered with water, whenever the change has occurred suddenly, or was caused by artificial forces intended to produce that change. . ."

Prior to the adoption of the above-quoted regulations the San Francisco District of the Corps of Engineers had published its Public Notices 71–22 (June 11, 1971) and 71–22(a) (January 18, 1972) which state that thenceforth the Corps would consider the limit of its jurisdiction over navigable waters established by the Rivers and Harbors Act to be "the plane of the mean of the higher high water" and that permits would be required for all "new work in unfilled portions of the interior of diked areas below former mean higher high water."

The case law definitions of navigable waters within the meaning of the Rivers and Harbors Act generally support the rules above quoted, although there are very few cases which concern navigable waters of the Pacific Coast.

The only case to specifically consider the MHHW phenomenon on the Pacific Coast is *United States v. Freethy,* C–73–1470 SC (N.D.Cal. Feb. 24, 1975). The court held, in its unpublished findings at pp. 1 and 8, that the Corps' jurisdiction on the Pacific Coast extends to the mean higher high water line and has always so extended since the enactment of the Rivers and Harbors Act of 1899; further, however, that (p. 9) the Corps was estopped from ordering the removal of fill from San Francisco Bay but that any new fill in the areas of San Francisco Bay there under consideration would require a permit.

The only other Pacific Coast case brought under the Rivers and Harbors Act of which we are aware is *United States v. Sunset Cove, Inc.,* 514 F.2d 1089 (9th Cir. 1975), which does not mention the distinction of MHHW and MHW, or even indicate whether the waters there under consideration were subject to tidal action.

Another Pacific Coast case, *Borax, Ltd. v. Los Angeles,* 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9 (1935) held that MHW was the proper line for determining *title* to certain harbor properties, but made no reference to the federal navigational servitude under the Rivers and Harbors Act or to the distinction of MHHW and MHW.

Other decisions arising on the Atlantic Coast, where there is no significant difference between MHW and MHHW, generally have held that navigable waters within the meaning of the Rivers and Harbors Act (and thus the jurisdiction of the Corps of Engineers under the Act) extends to the MHW line as defined in the above referenced Corps of Engineers regulations. See, for example, *United States v. Pot-Nets, Inc.,* 363 F.Supp. 812 (D.Del.1973), which cites the regulations and holds that the federal power to regulate "extends to the entire bed of a navigable waterway and includes all lands below ordinary high-water mark." *United States v. Cannon,* 363 F.Supp. 1045 (D.Del.1973), also upholds the Corps' regulations and holds that the Corps' jurisdiction extends to the "mean high water mark." In *United States v. Lewis,* 355 F.Supp. 1132 (S.D. Ga.1973), the court held that a marsh below the "original high water mark" was within the Corps' jurisdiction as defined in the Corps' regulations.

A leading Atlantic Coast case is *United States v. Stoeco Homes, Inc.,* 498 F.2d 597 (3d Cir. 1974) *cert. den.* 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975) which held that in tidal waters the Corps' jurisdiction is defined by "the ebb and flow of the tide" and includes tidal marshes, citing primarily dicta in Justice Field's opinion in *The Daniel Ball,* 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870).

The Supreme Court has not addressed the issue of the Corps' jurisdiction in cases arising under the Rivers and Harbors Act in tidal areas, but it has considered the issue in reference to rivers. The *Daniel Ball, supra,* defined the term "navigable waters" in reference to the admiralty jurisdiction in inland rivers.

It was this definition, according to *Stoeco,* supra at p. 609, that Congress later intended to adopt in the Rivers and Harbors Act. The *Daniel Ball* held:

"Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce . . . "

In *Greenleaf-Johnson Lumber Co. v. Garrison,* 237 U.S. 251, 35 S.Ct. 551, 59 L.Ed. 939 (1915), the Supreme Court stated, in reference to the extent of the Corps' jurisdiction under the Act, that:

"When Congress acts, necessarily its power extends to the whole expanse of the stream, and is not dependent upon the depth or shallowness of the water. To recognize such distinction would be to limit the power when and where its exercise might be most needed." *Id.* at p. 263, 35 S.Ct. at 555, 59 L.Ed. at 945.

See also *United States v. Rands,* 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967), a condemnation case concerning riparian land along the Columbia River, in which the court held, at p. 123, 88 S.Ct. at p. 267, 19 L.Ed.2d at p. 332, that the United States retains a navigational servitude over "the entire stream and the stream bed below ordinary high-water mark," a term not otherwise defined.

The cases are not entirely consistent in their interpretation of the extent of "navigable waters" within the meaning of the Rivers and Harbors Act, but they do appear to be based upon the principle, as stated by the Supreme Court in *Greenleaf, supra,* that the authority over navigable waters delegated by Congress to the Corps "necessarily . . . extends to the whole expanse" of the body of water, regardless of its depth or shallowness. In differing physical circumstances this principle must necessarily be applied differently. In the case of inland rivers the Supreme Court has implemented the principle by defining the limit of the Corps' jurisdiction as the

ordinary high water mark (*Rands, supra* ), provided the rivers are navigable in fact in their ordinary condition (*The Daniel Ball, supra* ). Along the Atlantic, where MHW and MHHW are not significantly different, the circuit and district courts have held that navigable waters include waters subject to the ebb and flow of the tide up to the line of MHW, although the leading *Stoeco* case also includes tidal marshes without reference to MHW.

On the Pacific Coast where MHW and MHHW do differ significantly, the only case of which we are aware which considers the issue, *Freethy, supra,* concludes that MHHW is the proper line. If we were to adopt MHW in the pending cases, simply because that standard has long been used in the very different circumstances prevailing on the Atlantic Coast, we would be following the letter of the earlier cases but ignoring their underlying principle. The wiser course is to recognize the Corps' jurisdiction, as nearly as practicable, so as to encompass the whole expanse of the body of water, just as has been done for inland rivers and along the Atlantic Coast.

■ Accordingly, we hold that the shoreward limit of "navigable waters" and "waters of the United States" along the Pacific Coast, including San Francisco Bay, within the meaning of the Rivers and Harbors Act, and therefore of the regulatory jurisdiction of the Army Corps of Engineers under the Act, extends to the mean higher high water line as defined at 33 CFR 209.260(k)(1)(ii). Thus the geographical extent of the Corps' jurisdiction under the Rivers and Harbors Act is coterminous with that under FWPCA.

## II. APPLICATION OF THE MHHW LINE TO THE PENDING CASES

The next question to consider on the present motions is whether or not the properties under consideration herein lie within navigable waters—i. e., within the line of MHHW—as above defined under the two acts in question. The answer depends upon whether we use the

*present* line of MHHW (which at least in part follows the outer edge of Leslie's dikes) or use instead the *former* line of MHHW of the Bay in its unobstructed natural state.

Leslie contends that any jurisdiction the Corps may once have had over these properties has long since been surrendered due to the Corps' failure to require permits for the construction of dikes in the past. Leslie cites *Stoeco,* supra, which held that the federal navigational servitude over the property there in question "had long since been surrendered" since the federal government had failed to assert its navigational servitude for eighty years. The property in *Stoeco* was filled former tidal marshland supporting streets and houses, which the court described as "fast land" and "improved solid upland." Accordingly, the court specifically limited its holding "to tidal marshlands which had become fast land prior to the change in policy of the Army Corps of Engineers."

Sierra Club contends that neither the construction of the dikes nor the Corps' inaction removed the areas behind the dikes from Corps jurisdiction, relying primarily on *Economy Light Co. v. United States,* 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847 (1921). *Economy* held that a river, which had been dammed since 1835 and had not been used for commerce for approximately a century, was, nevertheless, navigable within the meaning of the Rivers and Harbors Act, stating (p. 118, 41 S.Ct. p. 411, 65 L.Ed. p. 853):

> "The fact, however, that artificial obstructions exist capable of being abated by due exercise of the public authority, does not prevent the stream from being regarded as navigable in law, if, supposing them to be abated, it be navigable in fact in its natural state. The authority of Congress to prohibit added obstructions is not taken away by the fact that it has omitted to take action in previous cases."

In *United States v. Appalachian,* 311 U.S. 377, 408, 61 S.Ct. 291, 299–300, 85 L.Ed. 243, 253 (1940), the Supreme Court held, citing *Economy,* that "When once found to be navigable, a waterway remains so."

The rules of *Stoeco* and *Economy* are consistent in that under *Economy* the body of water in question remains navigable in law so long as the artificial obstruction is capable of being abated by due exercise of the public authority, whereas *Stoeco* holds, in effect, that the area in question ceases to be navigable in law only if the artificial obstruction has become fast land—i. e., improved solid upland.

The property here in question is not improved solid upland. It is instead unfilled Bay bottom, much if not all of it below the level of MHHW, and much of it still subject to periodic inundation by Bay water for the production of salt, but not now subject to the ebb and flow of the tide (though the latter point is disputed in No. 72–561). The property is such that, if the dikes were broken, it would return to its former natural condition of daily tidal inundation without the removal of any fill or other improvements. The dikes herein are, in short, much more closely akin to artificial obstructions capable of being abated by due exercise of the public authority as in *Economy,* than they are to the improved solid upland supporting streets and houses considered in *Stoeco.*

▉ For the foregoing reasons, we find that the diked areas here in question, which lie within the former line of MHHW in its unobstructed, natural state, are still within the jurisdiction of the Corps of Engineers under both the FWPCA and the Rivers and Harbors Act. Consequently, these areas are subject to regulation by the Corps pursuant both to the Rivers and Harbors Act as indicated in the Corps' Public Notices 71–22 and 71–22(a), and to the FWPCA.

### III. ESTOPPEL

▉ It is well established, as Sierra Club contends, that as a general principle equitable estoppel cannot be applied to deprive the public of the protection of

a statute because of mistake or inaction on the part of public officials. See *Maxwell Co. v. NLRB,* 414 F.2d 477, 479 (6th Cir. 1969), *Beaver v. United States,* 350 F.2d 4, 8 (9th Cir. 1965), *cert. denied* 383 U.S. 937, 86 S.Ct. 1067, 15 L.Ed.2d 854 (1966) and *United States v. Cappaert,* 508 F.2d 313, 319–20 (9th Cir. 1974), which so hold. In *Greenleaf,* supra, 237 U.S. at p. 264, 35 S.Ct. at p. 555–56, 59 L.Ed. at p. 946, the Supreme Court followed this principle (though without specifically so stating) when it upheld the denial of compensation for the removal of a wharf from navigable waters even though the federal government had not regulated that portion of navigable waters at the time the wharf was built. See also *Economy,* supra, which held that congressional authority to remove obstructions is not taken away by inaction for almost 100 years.

■ Despite the general principle that the government may not be estopped, equitable principles do impose some limits on the Corps' power to now regulate activities which it could have regulated in the past but instead ignored for decades. Although we have already held in our December 9, 1974 memorandum (403 F.Supp. 1292 at p. 1297), that the Corps has made timely assertion of its jurisdiction as to activities which were first brought within the Corps' jurisdiction by the FWPCA in 1972 (discharge of dredged or fill material), that holding does not extend to Corps' jurisdiction which stems from the Rivers and Harbors Act of 1889 (construction of a dam or dike or creation of some other obstruction).

In *Greenleaf,* supra, 237 U.S. at p. 268, 35 S.Ct. at p. 557, 59 L.Ed. at p. 947–48, the Supreme Court has stated that "arbitrary or wanton" action by the Secretary of War under the Rivers and Harbors Act may be subject to judicial review. In *Sunset Cove,* supra, at p. 1090, although the Ninth Circuit held that the Corps was not estopped because "Sunset was acting at its peril" when it filled a navigable water, nevertheless, the court of Appeals modified a district court order that the fill be removed entirely, stating that "the court might have tempered the law with a touch of equity."

In the pending cases we are unable to find that the Corps of Engineers is estopped from changing its policy and regulating the areas in question in the future. Nevertheless, we do find that in the circumstances of these cases it would be a violation of equitable principles of fairness for the Corps to now require permits for the maintenance of dikes which have been in place on the property here in question for more than 20 years—and in most cases for more than 50 years—without objection by the federal government.

## ORDER

For the foregoing reasons Leslie's motions for summary judgment in 72–561 and 73–2294 are denied, and the motion of Sierra Club and the Corps for summary judgment in 73–2294 is granted. The Court, on its own motion in 72–561 and pursuant to the motion for summary judgment of Sierra Club and the Corps in 73–2294, declares the rights and legal relations of the parties, on the record as it now stands, to be as follows:

(a) Pursuant to the FWPCA the Corps may require permits for the discharge of dredged or fill material up to the line of MHHW in its unobstructed natural state, as described in effect in the Corps' Public Notices 71–22 and 71–22(a);

(b) Pursuant to the Rivers and Harbors Act of 1899 the Corps may require permits for the construction of any new bridge, dam, dike or causeway, or for the creation of any new obstruction, up to the above-described line of MHHW, but the Corps is estopped from requiring permits under the Rivers and Harbors Act for any bridge, dam, dike, causeway or obstruction which has been long in place as hereinabove set forth.